**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

September 2, 2005

**PATRICK FISHER**
**Clerk**

---

JESSICA GONZALES, individually and as next best friend of her deceased minor children Rebecca Gonzales, Katheryn Gonzales and Leslie Gonzales,

    Plaintiff-Appellant,

v.

CITY OF CASTLE ROCK; AARON AHLFINGER; R. S. BRINK; MARC RUISI, Officers of the Castle Rock Police Department,

    Defendants-Appellees.

_____

COLORADO MUNICIPAL LEAGUE, COLORADO COUNTIES, INC., and COLORADO ASSOCIATION OF CHIEFS OF POLICE,

    Amici Curiae.

No. 01-1053

---

**ORDER**

---

Before **TACHA**, Chief Judge, **SEYMOUR**, **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN**, and **McCONNELL**, Circuit Judges.

---

The Supreme Court's decision in *Town of Castle Rock v. Gonzales*, 125 S.

Ct. 2796 (2005), reversed our decision in the same matter, *see Gonzales v. City of*

*Castle Rock*, 366 F.3d 1093 (10th Cir. 2004) (*en banc*).  Accordingly, we

**AFFIRM** the district court's dismissal of the case.  The mandate is issued

forthwith.

ENTERED FOR THE COURT


Stephanie K. Seymour
Circuit Judge

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 15 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

JESSICA GONZALES, individually and as next best friend of her deceased minor children Rebecca Gonzales, Katheryn Gonzales and Leslie Gonzales,

      Plaintiff - Appellant,

v.

CITY OF CASTLE ROCK; AARON AHLFINGER; R. S. BRINK; MARC RUISI, Officers of the Castle Rock Police Department,

      Defendants - Appellees.

No. 01-1053

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 00-D-1285)**

---

Brian J. Reichel, Attorney, Thornton, Colorado, for Plaintiff-Appellant.

Thomas S. Rice, Senter Goldfarb & Rice, L.L.C. (Eric M. Ziporin, Senter, Goldfarb & Rice, L.L.C. and Christina M. Habas, Bruno, Bruno & Colin, P.C., with him on the briefs), Denver, Colorado, for Defendants-Appellees.

---

Before **SEYMOUR**, **McWILLIAMS** and **GIBSON**,[*] Circuit Judges.

_____

**SEYMOUR**, Circuit Judge.

Jessica Gonzales brought this action under 42 U.S.C. § 1983 individually and on behalf of her deceased minor children against the City of Castle Rock, Colorado, and Castle Rock police officers Aaron Ahlfinger, R.S. Brink, and Marc Ruisi. Ms. Gonzales alleged that plaintiffs' substantive and procedural due process rights were violated when defendant police officers failed to enforce a restraining order against her estranged husband, Simon Gonzales, after he abducted the children. While Ms. Gonzales was seeking enforcement of the order, Mr. Gonzales murdered the children. Ms. Gonzales also alleged that the City failed to properly train its police officers with respect to the enforcement of restraining orders and had a custom or policy of recklessly disregarding the right to police protection created by such orders. The district court granted defendants' motion to dismiss, concluding that Ms. Gonzales failed to state a claim under the Fourteenth Amendment for the deprivation of either substantive or procedural due process. Ms. Gonzales appeals. We affirm in part, reverse in part, and remand for further proceedings.

_____

[*]The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

**I**

"In reviewing the grant of a 12(b)(6) motion, we apply the same standards as the district court." *David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996). We accept the well-pleaded allegations in the complaint as true and construe them most favorably to the plaintiff. *Id.* "A complaint may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) only 'if the plaintiff can prove no set of facts to support a claim for relief.'" *Id.* (quoting *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir. 1995)). Viewed in this light, the complaint sets out the following tragic facts.

On May 21, 1999, Ms. Gonzales obtained a temporary restraining order against her estranged husband, Simon, in connection with her divorce proceedings. Upon issuance, the order was entered into the central registry of restraining orders, a computerized database accessible to all state and local law enforcement agencies. The order was served on Mr. Gonzales on June 4, 1999, and made permanent on that date. Under the order, Mr. Gonzales was excluded from the family home and was prohibited from molesting or disturbing the peace of Ms. Gonzales and their three daughters, ages ten, nine, and seven. The order allowed Mr. Gonzales parenting time with the girls on alternating weekends and for two weeks during the summer. The order also provided that Mr. Gonzales,

"upon reasonable notice, shall be entitled to a mid-week dinner visit with the minor children. Said visit shall be arranged by the parties." Aplt. App. at A-30.

On Tuesday, June 22, 1999, sometime between 5:00 and 5:30 p.m., Simon Gonzales abducted the three girls while they were playing outside their house. Mr. Gonzales had not given advance notice to Ms. Gonzales or arranged with her for a mid-week dinner visit with the children. When Ms. Gonzales discovered the children were gone, she suspected that Simon, who had a history of suicidal threats and erratic behavior, had taken them. She called the Castle Rock Police Department for assistance at approximately 7:30 p.m. Officers Brink and Ruisi were sent to the Gonzales home, where Ms. Gonzales showed them a copy of the order, requesting that it be enforced and that the children be returned to her immediately. The Officers "stated that there was nothing they could do about the TRO and suggested that Plaintiff call the Police Department again if the three children did not return home by 10:00 p.m." Aplt. App. at A-9.

At about 8:30 p.m., Ms. Gonzales reached Simon on his cell phone and learned that he and the children were at Elich Gardens, an amusement park in Denver. Ms. Gonzales immediately called the Castle Rock police, spoke with Officer Brink, and requested that the police attempt to find and arrest Mr. Gonzales at Elich Gardens. Officer Brink refused to do so and told Ms. Gonzales to wait until 10:00 p.m. to see if Mr. Gonzales returned the children. At shortly

after 10:00, Ms. Gonzales called the police to report that the children were still missing and was told by the dispatcher to wait until midnight. At midnight she again called the police and told the dispatcher the children were still gone. At that point, she went to Simon Gonzales' apartment and found that he had not returned. She called the police from the apartment complex and was told by the dispatcher to wait there until the police arrived. No officer ever came and at about 12:50 a.m. she went to the police station and met with Officer Ahlfinger. He took an incident report, but did not attempt to enforce the TRO or to locate the three children.

At approximately 3:20 a.m., Simon Gonzales drove to the Castle Rock Police Station, got out of his truck, and opened fire with a semi-automatic handgun he had purchased shortly after abducting his daughters. He was shot dead at the scene. The police discovered the three girls, who had been murdered by Simon earlier that evening, in the cab of his truck.

## II

We turn first to Ms. Gonzales' claim that defendants violated plaintiffs' rights to substantive due process by failing to enforce the restraining order. The starting point for assessing this claim is the Supreme Court's discussion of the matter in *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189

(1989). There the plaintiff, a child abused by his father, sued social workers and their social services department alleging a substantive deprivation of his liberty interest occasioned by their failure to remove him from his father's custody despite knowledge of the abuse.

In support of her substantive due process claim, Ms. Gonzales points to the Colorado statute describing peace officers' duties with respect to the enforcement of such orders. As the Court indicated in *DeShaney*, however, while this statute is relevant to Ms. Gonzales' procedural due process claim, *see infra*, the language of the Due Process Clause itself must be the source of her substantive claim. *See DeShaney*, 489 U.S. at 195. In rejecting the substantive due process argument, the Court pointed out that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195.

> If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*Id.* at 196-97 (footnote omitted).

The Court did recognize "that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with

respect to particular individuals," *id.* at 198, but held that those circumstances arise only "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." *Id.* at 200. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* The Court also pointed out that although the state may have been aware of the dangers faced by the plaintiff in *DeShaney*, "it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201.

In keeping with the discussion in *DeShaney*, this court and others have recognized two exceptions to the rule that state actors are generally not liable for acts of private violence: "(1) the special relationship doctrine; and (2) the 'danger creation' theory." *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995). Ms. Gonzales does not contend a special relationship was created here by the state's assumption of control over an individual. We therefore turn our attention to the "danger creation" theory, under which a state may be liable for private conduct when it takes affirmative action which creates or increases the danger to the plaintiff. *See Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994).

> To make out a proper danger creation claim, a plaintiff must demonstrate that (1) the charged state entity and the charged

individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Currier v. Doran*, 242 F.3d 905, 918 (10th Cir. 2001) (citing *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262-63 (10th Cir. 1998)).

In order to satisfy the first requirement and show that the defendant created the danger or increased the plaintiff's vulnerability to it, a plaintiff must show affirmative conduct on the part of the defendant, *Graham*, 22 F.3d at 995, "that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been," *Armijo*, 159 F.3d at 1263 (quoting *Reed v. Gardner*, 986 F.2d 1122,1126 (7th Cir. 1993)). If this element is not shown, the substantive due process claim must fail. In assessing this factor, it is important to distinguish between affirmative conduct that creates or enhances a danger and a failure to act that merely does not decrease or eliminate a pre-existing danger. This distinction, while subtle, is critical under *DeShaney* and its progeny.

Ms. Gonzales contends the circumstances here are analogous to those in *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001), in which we held that the plaintiff had set out the requisite affirmative conduct in support of his substantive

due process claim.  In *Currier*, however, we took great care to point out that "[t]he danger creation theory . . . focuses on the affirmative actions of the state in placing the plaintiff in harm's way."  *Id.* at 919.  We concluded there that a defendant social worker had acted affirmatively by recommending that a parent be given legal custody of a child despite the defendant's knowledge of evidence and allegations that the parent had previously abused the child.  While we observed that the defendant had also failed to investigate or act on the allegations of abuse, we noted that this failure to act "should be viewed in the general context of the state's affirmative conduct in removing the children from their mother and placing the children with their father."  *Id.* at 920 n.7.

Although in the present case Ms. Gonzales attempts to characterize defendants' conduct as affirmative interference with the protection provided by the restraining order, in the end the individual defendants simply failed to act by refusing to enforce the order.  Their failure, while it did not reduce the danger posed by Simon Gonzales' abduction of the girls, did not create or enhance that danger.  This lack of affirmative conduct is fatal to Ms. Gonzales' substantive due process claim.  *See Graham*, 22 F.3d at 995 (substantive due process argument must fail when plaintiffs unable to "point to any affirmative actions by the defendants that created or increased the danger to the victims.").

**III**

We reach a different result with respect to Ms. Gonzales' procedural due process argument. This claim requires that we address an issue the Supreme Court did not reach in *DeShaney* because it was not timely raised – whether the state statute at issue gives "an 'entitlement' to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection against state deprivation under our decision in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972)." *DeShaney*, 489 U.S. at 195 n.2.

In *Roth*, the Court pointed out that "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests – property interests – may take many forms." *Roth*, 408 U.S. at 576. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* When, as here, a plaintiff contends that a constitutionally protected property

-10-

interest is created by a state statute, we have held that such an interest arises when "the regulatory language is so mandatory that it creates a right to rely on that language thereby creating an entitlement that could not be withdrawn without due process." *Cosco v. Uphoff*, 195 F.3d 1221, 1223 (10th Cir. 1999) (per curiam).

Ms. Gonzales relies on the language in the Colorado statute defining the crime of violating a restraining order and the duties of peace officers in that regard. Under that provision, officers "*shall* use every reasonable means to enforce a restraining order," COLO. REV. STAT. § 18-6-803.5(3)(a) (2002) (emphasis added), and "*shall* arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person when the peace officer has information amounting to probable cause that . . . [t]he restrained person has violated or attempted to violate any provision of a restraining order," *id.* § 18-6-803.5(3)(b)(I) (emphasis added). Ms. Gonzales contends the mandatory nature of the italicized language imposes a mandatory obligation on police officers to enforce the order and to arrest violators, and therefore gives persons with a restraining order a legitimate claim of entitlement to the protection the order is intended to provide.

In making this argument, Ms. Gonzales relies on cases from other jurisdictions holding that a property interest is created in a domestic violence

restraining order. For example, in *Siddle v. City of Cambridge*, 761 F. Supp. 503 (S.D. Ohio 1991), the court concluded that a protective order obtained pursuant to state law "creates a property right which incurs a duty on the part of the government." *Id.* at 509. The state statute there provided that "any officer of a law enforcement agency *shall* enforce a protection order issued . . . by any court in this state in accordance with the provisions of the order." OHIO REV. CODE ANN. § 3113.31(F)(3) (West 2002) (emphasis added). The court observed that holders of protective orders are entitled to greater rights than other citizens and that such an order "would have no valid purpose unless a means to enforce it exists." *Siddle,* 761 F. Supp. at 509.

In *Coffman v. Wilson Police Dep't*, 739 F. Supp. 257 (E.D. Pa. 1990), the court held that the state statute governing enforcement of protective orders did not create a property interest in police protection because the statute provided only that an arrest *may* be without a warrant upon violation of the order. But the court did hold that the order itself created an enforceable interest based on its requirement that the appropriate police department *shall* enforce it. *Siddle* and *Coffman* thus both hold that use of the word "shall" to impose a mandatory duty on police to enforce a protective order creates a legitimate claim of entitlement to, and thus a protected property interest in, the protection provided by the order.

"The word 'shall' is mandatory, not precatory, and its use in a simple declarative sentence brooks no contrary interpretation." *Id.* at 264.

In our case, the governing statute provides that an officer *shall* use every reasonable means to enforce an order and *shall* arrest a restrained person when the officer has information amounting to probable cause that the person has violated the order. The district court concluded that, notwithstanding the mandatory language used in the statute, no legitimate claim of entitlement to the enforcement duties set out therein could arise because those duties are only triggered when probable cause exists to believe that the restraining order has been violated. In the district court's view, determination of the existence of probable cause is discretionary and therefore cannot be the predicate for a mandatory duty. We disagree.

The Colorado courts have stated unambiguously that in Colorado statutes, "shall" does in fact mean "shall." "The word 'shall,' when used in a statute, involves a 'mandatory connotation' and hence is the antithesis of discretion or choice." *Colorado v. Guenther*, 740 P.2d 971, 975 (Colo. 1987); *see also Allison v. Indus. Claim Appeals Office*, 884 P.2d 1113, 1119-20 (Colo. 1994); *Hernendez v. District Court*, 814 P.2d 379, 381 (Colo. 1991). Moreover, the legislative history of the statute at issue clearly indicates that the legislature intended to

impose a mandatory obligation on the police as well as on others involved in the criminal justice system who deal with domestic abuse.

> First of all, . . . the entire criminal justice system must act in a consistent manner, which does not now occur. *The police must make probable cause arrests.* The prosecutors must prosecute every case. Judges must apply appropriate sentences, and probation officers must monitor their probationers closely. And the offender needs to be sentenced to offender-specific therapy.
>
> So this means the entire system must send the same message and enforce the same moral values, and that is abuse is wrong and violence is criminal. And so we hope that House Bill 1253 starts us down this road.

Brief of Aplt, attach., transcript of Colorado House Judiciary Committee Hearings on House Bill 1253, Feb. 15, 1994, at 3 (emphasis added).

Under the statute here, "[a] peace officer shall use every reasonable means to *enforce* a restraining order." COLO. REV. STAT. § 18-6-803.5(3)(a)(2002) (emphasis added). This mandatory duty is not premised upon the existence of probable cause, presumably because an arrest is not always necessary to enforce a restraining order. Moreover, the fact that the officer's mandatory duty extends only to the use of every reasonable means of enforcement does not negate a legitimate claim of entitlement to the use of those means. *See Siddle*, 761 F.

Supp. at 509 (holding that property interest in enforcement extends to reasonable efforts under the circumstances).[1]

The complaint in this case, viewed favorably to Ms. Gonzales, indicates that defendant police officers used no means, reasonable or otherwise, to enforce the restraining order. Under these circumstances, we conclude that Ms. Gonzales has effectively alleged a procedural due process claim with respect to her entitlement to enforcement of the order by every reasonable means.

The statute also imposes a duty on peace officers to *arrest* "when the peace officer has information amounting to probable cause" that the restrained person has violated or attempted to violate the restraining order. COLO. REV. STAT. § 18-6-803.5(3)(b)(2002). We do not agree with the district court that because the officer's mandatory duty to arrest only arises upon the existence of facts giving rise to probable cause, no legitimate claim of entitlement can ever exist. In our view, the statute clearly creates a mandatory duty to arrest when probable cause is present. It follows that the holder of an order has a legitimate claim of

---

[1]We do not imply that every use of the word "shall" in a statute will support a procedural due process claim. For example, a property right enforceable by the procedural due process clause requires that the "shall" language in a statute mandate a specific substantive outcome rather than merely referring to procedures. *See*, *e.g.*, *Doe v. Milwaukee County*, 903 F.3d 499, 502-04 (7th Cir. 1990)*; cf. Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1570 (10th Cir. 1993) (same re liberty interest). Here, however, the statute mandates not merely a procedure, but a specific outcome, enforcement of a restraining order.

entitlement to the protection provided by arrest when the officer has information amounting to probable cause that the order has been violated. The existence of probable cause is an objectively ascertainable matter evaluated on the basis of what a reasonably well-trained officer would know. *See Malley v. Briggs*, 475 U.S. 335, 345 (1986); *United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999). It therefore is not a matter committed to the officer's subjective discretion. *See Nearing v. Weaver*, 670 P.2d 137, 142 & n.7 (Ore. 1983) (duty to arrest domestic order violator not discretionary despite requirement that arrest be supported by probable cause); *Campbell v. Campbell*, 682 A.2d 272, 274-75 (N.J. Super. Ct. Law Div. 1996) (same).

Our review of the complaint in the light most favorable to Ms. Gonzales reveals that she has stated a procedural due process claim with respect to her entitlement to have Simon Gonzales arrested. She alleged that under the restraining order, Simon Gonzales was entitled to a mid-week dinner visit only upon reasonable notice and arrangement between the parties, and that no notice or arrangement had preceded his abduction of the children. She alleged that she showed defendant officers the order and told them that Simon had taken the children in violation of its provisions. These allegations, along with the invocation of the state statute defining the duties of peace officers with respect to

the violation of protective orders, set out a constitutional deprivation sufficient to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

Accordingly, we reverse the district court's decision that Ms Gonzales has failed to state a claim and remand for further proceedings in light of this opinion.[2] The City's argument that Ms. Gonzales could not establish municipal liability and the individual defendants' contention that they are entitled to qualified immunity are matters to be considered in the first instance by the district court on remand.

**REVERSED** and **REMANDED** for further proceedings.

---

[2] Defendants have filed a motion to strike documents attached by Ms. Gonzales to her brief on appeal. These materials, which consist of three state statutes and their legislative history, are required under the rules. *See* Fed. R. App. P. 28(f). Moreover, they are properly subject to judicial notice under Fed. R. Evid. 201, which may be taken at any stage in the proceedings. *See United States v. One (1) 1975 Thunderbird 2-Door Hardtop*, 576 F.2d 834, 836 (10th Cir. 1978) (judicial notice of state statutes); *Adarand Constr., Inc. v. Slater*, 228 F.3d 1147, 1168 n.12 (10th Cir. 2000) (judicial notice of content of hearings before legislative committees). Accordingly, defendants' motion is denied.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 29 2004**

**PATRICK FISHER**
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JESSICA GONZALES, individually
and as next best friend of her deceased
minor children Rebecca Gonzales,
Katheryn Gonzales and Leslie
Gonzales,

      Plaintiff-Appellant,

v.

CITY OF CASTLE ROCK; AARON
AHLFINGER; R. S. BRINK; MARC
RUISI, Officers of the Castle Rock
Police Department,

      Defendants-Appellees.

_____

COLORADO MUNICIPAL LEAGUE;
COLORADO COUNTIES, INC.; and
COLORADO ASSOCIATION OF
CHIEFS OF POLICE,

      Amici Curiae.

No. 01-1053

---

**ON REHEARING EN BANC**
**FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 00-D-1285)**

---

Brian J. Reichel, Attorney, Thornton, Colorado, for Plaintiff-Appellant.

Thomas S. Rice, Senter Goldfarb & Rice, L.L.C. (Eric M. Ziporin, Senter, Goldfarb & Rice, L.L.C. and Christina M. Habas, Bruno, Bruno & Colin, P.C., with him on the brief), Denver, Colorado, for Defendants-Appellees.

Carolynne White, Staff Attorney, Colorado Municipal League; Thomas J. Lyons, Hall & Evans, LLC, Denver, Colorado; and Julie C. Tolleson, Kennedy & Christopher, PC, Denver, Colorado, on the brief for Amici Curiae.

--------

Before **TACHA**, Chief Judge, **SEYMOUR**, **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN**, and **McCONNELL**, Circuit Judges.

--------

**SEYMOUR**, Circuit Judge.

--------

This civil rights case asks us to decide whether a court-issued domestic restraining order, whose enforcement is mandated by a state statute, creates a property interest protected by the due process clause of the Fourteenth Amendment. The district court held it does not and dismissed the action under FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief could be granted. A panel of this court reversed. *Gonzales v. City of Castle Rock*, 307 F.3d 1258 (10th Cir. 2002). On rehearing *en banc*, we reverse the district court's dismissal of Jessica Gonzales' procedural due process claim as to the City of Castle Rock, but hold that the individual police officers are entitled to qualified immunity.

-2-

**I**

"We review *de novo* the district court's dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted." *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002), *cert. denied*, 123 S.Ct. 1908 (2003). We accept as true all well-pleaded facts, liberally construe the pleadings, and make all reasonable inferences in favor of the plaintiff. *Id.* "The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support her claims." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). Only where it appears beyond a doubt that a plaintiff cannot prove any set of facts entitling her to relief, can a motion to dismiss be granted. *Id.* With these precepts guiding our review, the complaint sets forth the following tragic facts.

On May 21, 1999, Ms. Gonzales obtained a temporary restraining order limiting her husband's ability to have contact with her and their daughters, aged ten, nine and seven. The restraining order was issued by a state court in accordance with COLO. REV. STAT. § 14-10-108, and commanded in part that Mr. Gonzales "not molest or disturb the peace of [Ms. Gonzales] or . . . any child." Aplt. Appx. at 29. The restraining order further stated "the court . . . finds that physical or emotional harm would result if you are not excluded from the family

-3-

home," and directed Mr. Gonzales to stay at least 100 yards away from the property at all times. *Id.* *See also* COLO. REV. STAT. § 14-10-108(2)(c) (party can be excluded from family home upon a showing that physical or emotional harm would otherwise result).

Neither parent nor the daughters could unilaterally change the terms of the order because it explicitly states:

> If you violate this order thinking that the other party or a child named in this order has given you permission, **you are wrong**, and can be arrested and prosecuted. The terms of this order cannot be changed by agreement of the other party or the child(ren). Only the court can change this order.

SUSAN WENDALL WHICHER & CHERYL LOETSCHER, HANDBOOK OF COLORADO FAMILY LAW, ch. IV, F-12 at 2 (3d ed. 1996) (emphasis in original) (hereinafter "Restraining Order").[1] The order also contained explicit terms directing law enforcement officials that they "shall use every reasonable means to enforce" the

---

[1] In connection with their motion to dismiss, defendants provided the district court a copy of the front side of Ms. Gonzales' temporary restraining order, as well as a subsequent court order. Aplt. Appx. at 29. However, the back of the temporary restraining order was not included. Pursuant to FED. R. EVID. 201(b), (c), we may take judicial notice of the back of the restraining order form which is accessible in SUSAN WENDALL WHICHER & CHERYL LOETSCHER, HANDBOOK OF COLORADO FAMILY LAW, ch. IV, F-12 at 2 (3d ed. 1996). *See, e.g., Pueblo of Sandia v. United States*, 50 F.3d 856, 861 n.6 (10th Cir. 1995) (court took judicial notice of government reports and documents not contained in record below). In order to make the record on appeal complete, however, we asked Ms. Gonzales to provide the court with the back side of the order, which she has done. *See* Aplt. Supp. Appx. at 3 (filed April 19, 2004).

restraining order, they "shall arrest" or where impractical, seek an arrest warrant for those who violate the restraining order, and they "shall take the restrained person to the nearest jail or detention facility . . . ." *Id.*

Upon the trial court's issuance of the temporary restraining order, and pursuant to COLO. REV. STAT. § 18-6-803.7(2)(b), the order was entered into the state's central registry for such protective orders, which is accessible to all state and local law enforcement agencies. On June 4, 1999, the order was served on Mr. Gonzales. On that same date, upon "having heard the stipulation of the parties, and after placing the parties under oath and examining the parties as to the accuracy of the Stipulation . . . and finding that [the] Stipulation [was] in the best interests of the minor children," Aplt. Appx. at 30, the state court made the restraining order permanent. The temporary order's terms were slightly modified to detail Mr. Gonzales' rights to parenting time with his daughters on alternative weekends, and for two weeks during the summer. The order also allowed Mr. Gonzales "upon reasonable notice . . . a mid-week *dinner* visit with the minor children. Said visit shall be arranged by the parties." *Id.* (emphasis added). Finally, the order allowed Mr. Gonzales to collect the girls from Ms. Gonzales' home for the purposes of parental time. However, all other portions of the temporary restraining order remained in force, including its command that Mr. Gonzales was excluded from the family home and that he could not "molest or

disturb the peace" of Ms. Gonzales or the girls. *Id.* at 29.

Despite the order's terms, on Tuesday, June 22, 1999, sometime between 5:00 and 5:30 p.m., Mr. Gonzales abducted the girls while they were playing outside their home. Mr. Gonzales had not given Ms. Gonzales advanced notice of his interest in spending time with his daughters on that Tuesday night, nor had the two previously agreed upon a mid-week visit. When Ms. Gonzales realized her daughters were missing, she suspected that Mr. Gonzales, who had a history of erratic behavior and suicidal threats, had taken them. At approximately 7:30 p.m., she made her first phone call to the Castle Rock police department requesting assistance in enforcing the restraining order against her husband. Officers Brink and Ruisi were sent to her home. Upon their arrival, she showed them a copy of the restraining order, and asked that it be enforced and her children returned to her immediately. In contradiction to the order's terms, the Officers "stated that there was nothing they could do about the TRO and suggested that Plaintiff call the Police Department again if the children did not return home by 10:00 p.m." *Id.* at 9.

About an hour later, Ms. Gonzales spoke to Mr. Gonzales on his cellular telephone and he told her he was with the girls at Elitch Gardens, an amusement park in Denver. She immediately made a second call to the Castle Rock police department, and spoke with Officer Brink, requesting that the police find and

arrest Mr. Gonzales. Officer Brink refused to do so, and suggested Ms. Gonzales wait until 10:00 p.m. to see if the girls returned home. Shortly after 10:00 p.m., Ms. Gonzales called the police department and reported to the dispatcher that her daughters had yet to be returned home by their father. She was told to wait for another two hours. At midnight, she called the police department again and informed the dispatcher her daughters were still missing. She then proceeded to Mr. Gonzales' apartment complex and found no one at home. From there, she placed a fifth call to the police department and was advised by the dispatcher to wait at the apartment complex until the police arrived. No officers ever came to the complex, and at 12:50 a.m., Ms. Gonzales went to the Castle Rock police station, where she met with Officer Ahlfinger. Officer Ahlfinger took an incident report from Ms. Gonzales, but he made no further effort to enforce the restraining order against her husband or to find her children. Instead, he went to dinner.

At approximately 3:20 a.m., nearly eight hours after Ms. Gonzales first contacted the police department, Mr. Gonzales arrived at the Castle Rock police station in his truck. He got out and opened fire on the station with a semi-automatic handgun he had purchased soon after abducting his daughters. He was shot dead at the scene. The police found the bodies of the three girls, who had been murdered by their father earlier that evening, in the cab of the truck.

Ms. Gonzales subsequently brought this action on behalf of herself and her

deceased daughters against the City of Castle Rock, Colorado, and Castle Rock police officers Aaron Ahlfinger, R.S. Brink, and Marc Ruisi. Pursuant to 42 U.S.C. § 1983, she claimed her due process rights were violated by the officers' failure to enforce the restraining order against her husband. She also alleged the city maintained a custom and policy of failing to respond properly to complaints of domestic restraining order violations and tolerated the non-enforcement of such protective orders by police officers, resulting in the reckless disregard of a person's right to police protection granted by such orders.

The district court granted the defendants' motion to dismiss, finding Ms. Gonzales failed to state a claim under the Fourteenth Amendment for the deprivation of either substantive or procedural due process.[2] On appeal, the panel affirmed the district court's dismissal of Ms. Gonzales' substantive due process claim, but reversed as to the district court's procedural due process determination. The panel held the restraining order, coupled with the Colorado statute mandating the enforcement of such orders, *see* COLO. REV. STAT. § 18-6-803.5(3), established a protected property interest in the enforcement of the restraining order which could not be taken away by the government without procedural due

---

[2]Because the district court found Ms. Gonzales failed to state a claim upon which relief could be granted, the court did not address the individual officers' request for dismissal on the basis of qualified immunity, or the city's request for dismissal on the grounds Ms. Gonzales could not establish municipal liability.

process. *Gonzales*, 307 F.3d at 1266. The panel concluded, therefore, that Ms. Gonzales' procedural due process claim could proceed.

The city and police officers timely filed a petition for rehearing *en banc*, seeking review of the panel's conclusion that Ms. Gonzales stated a procedural due process claim. This court granted the petition, and asked the parties to address the following questions: (1) whether COLO. REV. STAT. § 18-6-803.5(3) in combination with the restraining order issued by the Colorado court created a property interest entitled to due process protection and, (2) if so, what process was due.

## II

To succeed in her § 1983 claim, Ms. Gonzales must show that she was deprived of a constitutional right by a person acting under color of state law. *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927 F.2d 1111, 1115 (10th Cir. 1991). At issue here is whether Ms. Gonzales' due process rights, pursuant to the Fourteenth Amendment of the U.S. Constitution, were violated when the officers failed to enforce her restraining order against her husband.

The Fourteenth Amendment specifies that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1. The Supreme Court has noted that the contours of this

constitutional provision "guarantee more than fair process and . . . cover a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (internal citation and quotations omitted). In *Lewis*, the Supreme Court explained that

> [s]ince the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action . . . . We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective.

*Id.* at 845-46 (internal quotations and citations omitted). Ms. Gonzales' complaint encompassed both substantive and procedural due process challenges, both of which the district court dismissed. In the substantive due process context, the argument was that Ms. Gonzales and her daughters had an inherent Constitutional right to police protection against harm from her husband. However, as noted in our panel opinion, the Supreme Court made clear in *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989), that the Constitution itself does not require a state to protect its citizens from third party harm, and Ms. Gonzales' case does not fall within the narrow "danger

"creation" exception arising out of *DeShaney*.[3] *See Gonzales*, 307 F.3d at 1262-63.

Contrary to the assertions of the city and officers, as well as those of our dissenting colleagues, the issue before this *en banc* court is distinct from the substantive due process claim dismissed below. Defendants and the dissenters assert that if this court concludes Ms. Gonzales has a protected property right in the enforcement of the restraining order, we will have "carved out an exception contrary to *DeShaney* and the general rule that the state does not have an affirmative duty to protect individuals from private third parties." Aple. Br. at 6. However, *DeShaney* limited its constitutional review to whether a substantive due process right to government protection exists in the abstract, and specifically did not decide whether a state might afford its citizens "an 'entitlement' to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection against state deprivation" under *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). *DeShaney*, 489 U.S. 189, 195 n.2 (1989). As we discuss *infra*, *Roth* clarified that "[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain

---

[3]The *en banc* court was not asked to address the district court's dismissal of Ms. Gonzales' substantive due process claim and the panel's affirmance thereof. Hence, that portion of the panel opinion remains undisturbed.

-11-

benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577.

We are not being asked here to address whether Ms. Gonzales had a substantive right under the Constitution to receive government protection that could not be denied without a "reasonable justification in the service of a legitimate government objective." *Lewis*, 523 U.S. at 846. Rather, we must determine whether the state of Colorado created in Ms. Gonzales an entitlement that cannot be taken away from her without procedural due process, and if so, whether the officers' arbitrary denial of that entitlement was procedurally unfair. None of our dissenting colleagues who claim that we are improperly mixing substantive and procedural due process concepts suggest that the state of Colorado could not create such an entitlement if it chose to do so despite *DeShaney*'s holding that there is no such entitlement protected by the substantive due process clause.[4]

---

[4]The cases Judge O'Brien cites in his dissent for the argument that our opinion ignores *DeShaney*'s guiding principles, are only of limited support. *See, e.g.*, *Collins v. City of Harker Heights*, 503 U.S. 115 (1992); *Jones v. Union County*, 296 F.3d 417 (6th Cir. 2002); *Henderson v. Gunther*, 931 P.2d 1150 (Colo. 1997). *Collins*, *Jones*, and *Henderson* all specifically address questions regarding substantive rather than procedural due process. While the court in *Jones* rightly rejected the plaintiff's reliance on *Roth* for the proposition that violation of a state statute could give rise to a substantive due process claim, it did not provide any further discussion on whether the state statute at issue had in fact created a protected property interest subject to procedural due process protections. *Jones*, 296 F.3d at 429. The courts in *Doe by Fein v. District of Columbia*, 93 F.3d 861 (D.C. Cir. 1996), and *Doe by Nelson v. Milwaukee Co.*,

(continued...)

-12-

When the due process clause is "invoked in a novel context, it is our practice to begin the inquiry with a determination of the precise nature of the private interest that is threatened by the State. Only after that interest has been identified, can we properly evaluate the adequacy of the State's process." *Lehr v.*

---

[4](...continued)
903 F.2d 499 (7th Cir. 1990), rejected claims that property interests in child protective services were created *solely* by state statutes which outlined procedures. *Doe by Fein*, 93 F.3d at 868-69; *Doe by Nelson*, 903 F.2d at 502-03. Here, we are examining whether the restraining order and a statute mandating its enforcement creates a property interest.

We certainly concur with the common refrain in these cases that the mere violation of state law does not automatically give rise to a constitutional due process violation, and that the due process clause should not be so stretched that it becomes "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Daniels v. Williams*, 474 U.S. 327, 332 (1986) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). *See also Collins*, 503 U.S. at 127; *Harrill v. Blount County*, 55 F.3d 1123, 1125-26 (6th Cir. 1995); *Archie v. City of Racine*, 847 F.2d 1211, 1216-17 (7th Cir. 1988); *Henderson*, 931 P.2d at 1154-55. We are not ruling that defendants' disregard of the restraining order's terms and refusal to enforce COLO. REV. STAT. § 18-6-803.5(3) transformed what otherwise might be a state law tort claim into a federal due process action merely because defendants were state actors. Rather, the specific issue we grapple with here is whether the state of Colorado has created an entitlement for Ms. Gonzales as described in *Roth*. Only upon our determination that Ms. Gonzales has a property interest in enforcement of the court order can the claim be made that defendants' deprivation of that interest resulted in a procedural due process violation. Such a claim is entirely distinct from the substantive due process claim addressed in *DeShaney*. Of course, *DeShaney* makes clear that all individuals do not possess a substantive right to protection by the state from the harm of third parties. *DeShaney*, 489 U.S. at 197. But such a ruling does not foreclose a state from creating through its own laws an entitlement for particular citizens in having their court-issued restraining orders enforced. Our opinion is therefore not contrary to *DeShaney*.

*Robertson*, 463 U.S. 248, 256 (1983) (citations omitted). *See also Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). We acknowledge this case raises compelling and novel questions about state created property interests and the manner by which such interests are protected by the Fourteenth Amendment. However, we are persuaded Ms. Gonzales' complaint states a claim that she possessed a protected property interest in the enforcement of the terms of her restraining order and that the officers' arbitrary denial of that entitlement violated her procedural due process rights. In reaching this conclusion, we begin by examining the restraining order issued to Ms. Gonzales and the Colorado statute mandating its enforcement.[5]

---

[5]In this context, many of the cases Judge O'Brien cites in his dissent are inapposite to the specific facts and legal arguments raised in the present case because the courts in those cases rejected the argument that statutes detailing procedures regarding general child abuse investigations and reporting could *alone* create a protected interest in such services. *See, e.g., Doe by Fein*, 93 F.3d at 869; *Doe by Nelson*, 903 F.2d at 502-03; *Pierce v. Delta County Dep't of Soc. Servs.*, 119 F. Supp. 2d 1139, 1152-53 (D. Colo. 2000). In this case, the Colorado statute alone does not create the property interest. Rather, the court-issued restraining order, which specifically dictated that its terms must be enforced, and the state statute commanding the same, establish the basis for Ms. Gonzales' procedural due process claim.

Likewise, we disagree with Judge O'Brien's assertion that the Colorado Supreme Court made clear in *Henderson* that a case like Ms. Gonzales' could not be brought under § 1983. *Henderson* was framed entirely as a substantive due process case and did not address in any manner how and whether a state might grant to a particular person a constitutionally protected property interest in protective services. *Henderson*, 931 P.2d at 1154-56.

-14-

**A**

Our analysis must start with the familiar rubric of *Roth*.  In *Roth*, the

Supreme Court noted that "property" is a "broad and majestic term."  *Roth*, 408

U.S. at 571.  The Court "made clear that the property interests protected by

procedural due process extend well beyond actual ownership of real estate,

chattels, or money," *id.* at 571-72, and "may take many forms," *id.* at 576.

"Property interests . . . are not created by the Constitution.  Rather, they are

created and their dimensions are defined by existing rules or understandings that

stem from an independent source such as state law – rules or understandings that

secure certain benefits and that support claims of entitlement to those benefits."

*Id.* at 577.  A property interest is created when a person has secured an interest in

a specific benefit to which the individual has "a legitimate claim of entitlement."

*Id.*  The interest must be more than an "abstract need or desire" or a "unilateral

expectation of" the benefit.  *Id.*  The Court has accordingly identified property

rights protected under the procedural due process clause to include continued

public employment, *Perry v. Sindermann*, 408 U.S. 593, 602-03 (1972), a free

education, *Goss v. Lopez*, 419 U.S. 565, 574 (1975), garnished wages, *Sniadach v.*

*Family Finance Corp.*, 395 U.S. 337, 339 (1969), professional licenses, *Barry v.*

*Barchie*, 443 U.S. 55, 64 (1979), driver's licenses, *Bell v. Burson*, 402 U.S. 535,

539 (1971), causes of action, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428

(1982), and the receipt of government services, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11-12 (1978) (utility services); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (disability benefits); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (welfare benefits).

At least two other courts have addressed whether a court order creates a *Roth*-type entitlement subject to procedural due process protections. Directly applicable here is *Coffman v. Wilson Police Dep't*, 739 F. Supp. 257 (E.D. Pa. 1990), in which the court found the mandatory language in a restraining order created a "property interest in police enforcement that is cognizable under *Roth*." *Id.* at 264. In *Flynn v. Kornwolf*, 83 F.3d 924 (7th Cir. 1996), the plaintiffs contended the specific terms of a court order created in them an entitlement to employment. After examining the order's terms, the Seventh Circuit disagreed, concluding that the order's language was not of a mandatory nature limiting the employer's discretion regarding the termination of certain positions. *Id.* at 927 (citing *Fittshur v. Village of Menomonee Falls*, 31 F.3d 1401, 1406 (7th Cir. 1994)). In doing so, the Seventh Circuit analyzed the court order pursuant to the analysis employed in cases determining whether a state statute creates a property interest.

In order for an entitlement to exist, the underlying state law or order must contain

particularized standards or criteria [guiding] the State's decision makers. *If the decision maker* is not required to base its decisions on objective and defined criteria, but instead *can deny the requested relief for any constitutionally permissible reason or for no reason at all, the State has not created a constitutionally protected interest.*

*Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) (emphasis added) (citation and internal quotations omitted). Conversely, "the use of explicitly mandatory language, in connection with the establishment of specified substantive predicates to limit discretion, forces a conclusion that the state has created a [protected] interest." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989) (internal quotations omitted). *See also Bd. of Pardons v. Allen*, 482 U.S. 369, 379-81 (1987) (mandatory language in regulation, coupled with specific criteria which must be met in order to deny benefit, creates presumption of entitlement); *Hewitt v. Helms*, 459 U.S. 460, 471 (1983) ("the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest"); *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 11-12 (1979) (structure of regulatory provision together with word "shall" requires decision maker to take specific action unless particular criteria is met). Hence, where a court order commands the grant of a government benefit or service through the use of mandatory language and objective predicates limiting the discretion of official

-17-

decision makers, a protected property interest exists.[6]  We therefore examine the

restraining order to determine whether its "language is so mandatory that it

creates a right to rely on that language thereby creating an entitlement that could

not be withdrawn without due process."  *Cosco v. Uphoff*, 195 F.3d 1221, 1223

(10th Cir. 1999) (per curiam).[7]

_____

[6]We note *Olim*, *Thompson*, *Allen*, *Hewitt*, and *Greenholtz* addressed the
extent to which liberty interests exist in the prison setting.  But the methodology
used in those cases has also been "employed in claims of property interests
protected by the Due Process Clause of the Fourteenth Amendment."  *Cosco v.
Uphoff*, 195 F.3d 1221, 1223 (10th Cir. 1999) (per curiam). We also acknowledge
the Supreme Court, in *Sandin v. Conner*, 515 U.S. 472 (1995), abandoned the use
of this methodology when examining whether a prisoner properly claims a liberty
interest violation.  *Id.* at 483-84 & n.5.  But, the Court did not foreclose use of
this analysis in non-prison settings, stating such an approach "may be entirely
sensible in the ordinary task of construing a statute defining rights and remedies
available to the general public."  *Id.* at 481.  Accordingly, in determining whether
property interests exist pursuant to statute, courts have continued to examine the
extent to which the statute's mandatory language and substantive criteria limit
decision maker discretion.  *See, e.g., Crown Point I, LLC v. Intermountain Rural
Elec. Ass'n.*, 319 F.3d 1211, 1216-17 (10th Cir. 2003) (land development code did
not create property interest in special use hearing); *Wash. Legal Clinic for the
Homeless v. Barry*, 107 F.3d 32, 37 (D.C. Cir. 1997) (no property interest in right
to homeless shelter); *Mallette v. Arlington County Employees' Supplemental Ret.
Sys. II*, 91 F.3d 630, 637 (4th Cir. 1996) (disability retirement benefits constituted
property right).  Likewise, as previously noted, this analysis has also been
employed to determine whether a court order created a property interest.  *See
Flynn v. Kornwolf*, 83 F.3d 924, 927 (7th Cir. 1996).

[7]Although it may ultimately be found that an individual does not satisfy the
relevant criteria necessary to receive the benefit, the underlying property
entitlement remains and cannot be denied without due process of law.  For
example, in *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11-12 (1978),
the Supreme Court held that customers of a public utility had a protected property
interest in continued receipt of electricity while disputing their bills.  The Court

(continued...)

At the outset, we emphasize that Ms. Gonzales' entitlement to police enforcement of the restraining order against Mr. Gonzales arose when the state court judge issued the order, which defined Ms. Gonzales' rights. The restraining order was granted to Ms. Gonzales based on the court's finding that "irreparable injury would result to the moving party if no order were issued," Aplt. Appx. at 29, and that "physical or emotional harm would result if [Mr. Gonzales was] not excluded from the family home." *Id.* By its specific terms, the order made clear that Mr. Gonzales could not "molest or disturb the peace" of Ms. Gonzales or her children. *Id.* Likewise, the order gave notice to Mr. Gonzales that he could "be arrested without notice if a law enforcement officer [had] probable cause to believe that [he] knowingly violated the order." Restraining Order at 2.[8]

---

[7](...continued)
reached this conclusion even though the utility had the power under state law to terminate service "for good and sufficient cause." *Id.* Likewise, in *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), individuals challenging the termination of welfare benefits could not be denied the benefit without due process, even if the individuals were eventually deemed ineligible for relief. *See also Mallette*, 91 F.3d at 637 (party had property interest in potential eligibility for disability retirement benefits, regardless of whether party would prevail on merits). In the instant case, the restraining order's terms specifically mandate an outcome "to be reached upon a finding that the relevant criteria have been met," *Doyle v. Okla. Bar Assoc.*, 998 F.2d 1559, 1570 (10th Cir. 1993) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989)) (emphasis deleted), that outcome being its enforcement.

[8]As we noted earlier, the terms of Ms. Gonzales' May 12, 1999 restraining order against her husband became permanent on June 4,1999, after the trial court held a hearing, "heard the stipulation of the parties . . . [placed] the parties under

(continued...)

-19-

The restraining order's language also clearly evinced the state's intent that its terms be enforced by the police. Included within the order was a notice to law enforcement officials stating "[y]ou *shall* use every reasonable means to enforce this restraining order." *Id.* It further dictated that an officer

> *shall* arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of the restrained person when you have information amounting to probable cause that the restrained person has violated or attempted to violate any provision of this order and the restrained person has been properly served with a copy of this order or has received actual notice of the existence of this order.

*Id.* (emphasis added). Additionally, officers were required to enforce the order "even if there is no record of it in the restraining order central registry." *Id.* Finally, the order commanded that the officers "shall take the restrained person to the nearest jail or detention facility utilized by your agency." *Id.*

Not only does the order itself mandate that it be enforced, but the Colorado legislature passed a series of statutes to ensure its enforcement. The front of Ms. Gonzales' restraining order states that it was issued pursuant to COLO. REV. STAT. § 14-10-108. That statute details that a party may request the court to issue an order "[e]njoining a party from molesting or disturbing the peace of the other

---

[8](...continued)
oath and [examined] the parties as to the accuracy of the Stipulation . . . and [found] that [the] Stipulation [was] in the best interests of the children." Aplt. Appx. at 30.

party or of any child [or] [e]xcluding a party from the family home . . . upon a showing that physical or emotional harm would otherwise result." COLO. REV. STAT. § 14-10-108(2)(b)-(c). In addition, COLO. REV. STAT. § 14-10-109 dictates that "[t]he duties of police officers enforcing orders issued pursuant to . . . 14-10-108 shall be in accordance with section 18-6-803.5, C.R.S. . . . ." COLO. REV. STAT. § 14-10-109. Section 18-6-803.5 provides:

> (3)(a) Whenever a restraining order is issued, the protected person shall be provided a copy of such order. A peace officer shall use every reasonable means to enforce a restraining order.
> (b) A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person when the peace officer has information amounting to probable cause that:
> (I) The restrained person has violated or attempted to violate any provision of the restraining order; and
> (II) The restrained person has been properly served with a copy of the restraining order or the restrained person has received actual notice of the existence and substance of such order.
> (c) In making the probable cause determination described in paragraph (b) of this subsection (3), a peace officer shall assume that the information received from the registry is accurate. A peace officer shall enforce a valid restraining order whether or not there is a record of the restraining order in the registry.

COLO. REV. STAT. § 18-6-803.5(3) (2002). This language is similar to that which appears in the restraining order.[9]

---

[9]While we asked the parties to brief whether a protected property interest was created by the mandatory terms and objective predicates laid out in COLO. REV. STAT. § 18-6-803.5(3), we do not so hold. Rather, we conclude that the statute's force derives from the existence of a restraining order issued by a court

(continued...)

The district court concluded that any duty imposed upon police officers to enforce restraining orders is triggered only upon an officer's probable cause determination that the restraining order was being violated. According to the district court, because an officer's probable cause determination implicitly requires the use of judgment and discretion, no absolute duty is derived from the language mandating arrest and hence no protected property right existed. The district court is incorrect.

---

[9](...continued)
on behalf of a particular person and directed at specific individuals and the police.

In this context, we disagree with the dissenters' assertions that because the police are not named parties in the restraining order, they are therefore not bound to enforce its terms. *See* Kelly, J., dissent at 12; O'Brien, J., dissent at 8-9, 15-16. Surely the dissenters do not mean that police officers in Colorado are at liberty to ignore the terms of court orders, especially where such orders clearly direct police enforcement and are issued pursuant to legislation anticipating the same. *See* COLO. REV. STAT. § 18-6-803.5(a)&(b). Other states, in clarifying the duties of police officers in these situations, have by no means sanctioned an officer's failure to enforce terms appearing in a restraining order and mandated by statute. *See, e.g., Matthews v. Pickett County*, 996 S.W.2d 162, 164 (Tenn. 1999) (in state tort action, officers were required to arrest offending party upon reasonable cause that party was violating restraining order where order as well as statute mandated arrest in such situations); *Campbell v. Campbell*, 682 A.2d 272, 275 (N.J. Super. Ct. Law Div. 1996) (officer not immune from liability in negligence action where legislature "made it clear that a police officer must enforce a domestic violence order and all other laws which protect domestic violence victims"), *rejected in part on other grounds by Macaluso v. Knowles*, 775 A.2d 108, 111 (N.J. Super. Ct. App. Div. 2001); *Nearing v. Weaver*, 670 P.2d 137, 142 (Or. 1983) (while restraining order was not addressed to police, they nonetheless had duty pursuant to statute to enforce terms of order when they had probable cause to believe order had been served and filed and named party had violated order).

-22-

There can be no question that the restraining order here mandated the arrest of Mr. Gonzales under specified circumstances, or at a minimum required the use of reasonable means to enforce the order. Those circumstances were defined by the restraining order which told the police what its objective terms were and commanded that an arrest occur upon an officer's probable cause determination that the order was being violated and that Mr. Gonzales had notice of the order. The restraining order here specifically directed, with only the narrowest of exceptions, that Mr. Gonzales stay away from Ms. Gonzales and her daughters. Thus, the restraining order provided objective predicates which, when present, mandated enforcement of its terms. *See Olim*, 461 U.S. at 249; *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216-17 (10th Cir. 2003); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 2000); *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1998); *Mallette v. County Employee's Supplemental Ret. Sys. II*, 91 F.3d 630, 635-36 (4th Cir. 1996).

In this context, and contrary to the district court's conclusion, a police officer's finding of probable cause is not a wholly discretionary determination which undermines the mandatory edict of the restraining order or statute. While an officer must obviously exercise some judgment in determining the existence of probable cause, the validity and accuracy of that decision is reviewed under

-23-

objectively ascertainable standards and judged by what a reasonably well-trained officer would know. *See Malley v. Briggs*, 475 U.S. 335, 345 (1986). *See also Beck v. Ohio*, 379 U.S. 89, 96 (1964) ("When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would warrant a man of reasonable caution in the belief that an offense has been committed.") (quotation and citation omitted); *United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999) (probable cause is measured against objective standard and evaluated against what a prudent, cautious and well trained officer would believe).

In *Allen*, the Supreme Court noted one could use the term "discretion" in two distinct ways.[10] "In one sense of the word, an official has discretion when he or she 'is simply not bound by standards set by the authority in question.'" *Allen*, 482 U.S. at 375 (citing R. DWORKIN, TAKING RIGHTS SERIOUSLY 32 (1977)). In the alternative, "the term discretion may instead signify that 'an official must use judgment in applying the standards set him [or her] by authority.'" *Id.* (citing DWORKIN, *supra* at 31, 32). *See also Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir. 1988) (the determination of probable cause "represents a

---

[10]As we previously pointed out, while the Supreme Court has precluded use of the statutory analysis employed in *Allen* to determine the existence of liberty interests in a prison setting, *see Sandin*, 515 U.S. at 482-83, application of its reasoning to other settings remains valid, *id.* at 481.

judgment call on the part of the officer or officers at the scene taking into account the particular circumstances.  Although there are clearly guidelines, much depends upon the individual officers' assessment.").  In *Allen*, the Supreme Court concluded parole guidelines created a liberty interest in parole where the guidelines mandated release upon the parole board's finding of certain factors. *Allen*, 482 U.S. at 381.  While the parole board did have discretion within the Court's latter definition of the term to determine whether a prisoner satisfied the release criteria, such discretion did not extinguish the protected interest.  So too in the instant case, where a court has specified the objective circumstances in which the police officer is required to act.

An officer must certainly exercise a measure of judgment and discretion in determining whether probable cause exists.  However, in making that decision, the officer is bound to "facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information [which] are sufficient to lead a prudent person to believe the arrestee has committed or is committing an offense." *Guffey v. Wyatt*, 18 F.3d 869, 873 (10th Cir. 1994) (internal quotation omitted).  *See also Nearing v. Weaver*, 670 P.2d 137, 142 & n.7 (Or. 1983) (duty to arrest domestic order violator not discretionary despite requirement that arrest be supported by probable cause); *Campbell v. Campbell*, 682 A.2d 272, 274-75 (N.J. Super. Ct. Law Div. 1996) (same), *rejected in part on*

*other grounds by Macaluso v. Knowles*, 775 A.2d 108, 111 (N.J. Super. Ct. App. Div. 2001). Thus, an officer's determination of probable cause is not so discretionary as to eliminate the protected interest asserted here in having the restraining order enforced according to its terms. The officer must make a decision which, upon review, will be deemed right or wrong. Moreover, once probable cause exists, any discretion the officer may have possessed in determining whether or how to enforce the restraining order is wholly extinguished. If the officer has probable cause to believe the terms of the court order are being violated, the officer is required to arrest or to seek a warrant to arrest the offending party.

We also acknowledge there are some settings in which an officer's need to make split-second decisions in exigent circumstances might undermine a claim for protection under the Fourteenth Amendment. *Cf. Lewis*, 523 U.S. at 854-55 (substantive due process context). The officers here, however, were not faced with the necessity of making an instant judgment in a rapidly evolving situation. More importantly, they were not given carte blanche discretion to take no action whatsoever. The restraining order and its enforcement statute took away the officers' discretion to do nothing and instead mandated that they use every reasonable means, up to and including arrest, to enforce the order's terms.

Nor do we believe the language commanding that the officers use "every reasonable means to enforce this restraining order," Restraining Order at 2, undermines the order's mandatory nature. First, the order's more general command of enforcement by "every reasonable means" does not negate its more specific command that officers shall make arrests or obtain arrest warrants when certain requirements are met.[11] Second, the order's language commanding that officers use every reasonable means to enforce the order simply indicates there may be instances where the mandatory duty of enforcing a restraining order could be accomplished through means other than arrest. Such a position is not unprecedented. Courts finding an entitlement in the enforcement of protective orders have defined the property interest in terms of a reasoned police response or reasonable protection. *See Siddle v. City of Cambridge*, 761 F.Supp. 503, 510 (S.D. Ohio 1991) ("when a protective order exists . . . there is a governmental

---

[11]Accepting as true the well-pleaded facts in Ms. Gonzales' complaint, and making all reasonable inferences in her favor, *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002), *cert. denied* 123 S.Ct. 1908 (2003), it is clear the police had probable cause to believe that Mr. Gonzales was violating the order. Even if the police may have initially questioned Ms. Gonzales' credibility when she told them Mr. Gonzales was violating the order, they had information arguably amounting to probable cause by at least 8:30 p.m. when Ms. Gonzales informed them her husband had taken their daughters to the amusement park. At the very minimum, the police had probable cause when Ms. Gonzales called the station for the third time at 10:00 p.m., well past a mid-week "dinner visit" with young children. They were not at liberty to second guess the objective terms of the court order, just as Mr. Gonzales was not at liberty to change its terms.

duty to protect the individual, the scope of which is a reasonable protection given the resources of the governmental agency responsible"); *Coffman*, 739 F.Supp. at 266 (nature of property right in restraining order is a "reasoned police response"). Hence, while the police officers may have some discretion in how they enforce a restraining order, this by no means eviscerates the underlying entitlement to have the order enforced if there is probable cause to believe the objective predicates are met. After all, states are afforded vast discretion in how to educate their children, but the existence of such discretion did not prevent the Supreme Court from concluding that the ultimate receipt of the benefit – a free education – was a protected entitlement. *See Goss*, 419 U.S. at 573-74.

The state's intent in creating a protected interest in the enforcement of restraining orders is highlighted by the legislative history for the statute, which emphasizes the importance of the police's mandatory enforcement of domestic restraining orders. *See* COLO. REV. STAT. § 18-6-803.5. Recognizing domestic abuse as an exceedingly important social ill, lawmakers

> wanted to put together a bill that would really attack the domestic violence problems . . . and that is that the perpetrator has to be held accountable for his actions, and that the victim needs to be made to feel safe.
> . . . .
> First of all, . . . *the entire criminal justice system must act in a consistent manner, which does not now occur. The police must make probable cause arrests. The prosecutors must prosecute every case.* Judges must apply appropriate sentences, and probation officers must

-28-

monitor their probationers closely.  And the offender needs to be sentenced to offender-specific therapy.

*So this means the entire system must send the same message and enforce the same moral values, and that is abuse is wrong and violence is criminal.*  And so we hope that House Bill 1253 starts us down this road.

Aplt. Appx. at 121-122, Transcript of Colorado House Judiciary Hearings on House Bill 1253, February 15, 1994 (emphasis added).  *See also* Michael Booth, *Colo. Socks Domestic Violence*, DENVER POST, June 24, 1994, at A1 (law mandates arrest when restraining order is violated or police suspect domestic violence); John Sanko, *Stopping Domestic Violence: Lawmakers Take Approach of Zero Tolerance as They Support Bill, Revamp Laws*, ROCKY MOUNTAIN NEWS, May 15, 1994, at 5A (police must arrest and remove accused when answering domestic violence calls).  The Colorado legislature clearly wanted to alter the fact that the police were not enforcing domestic abuse restraining orders.

Most significantly, the legislature included in the statute a provision which states that

> [a] peace officer arresting a person for violating a restraining order or otherwise enforcing a restraining order shall not be held criminally or civilly liable for such arrest or enforcement unless the peace officer acts in bad faith and with malice or does not act in compliance with rules adopted by the Colorado supreme court.

COLO. REV. STAT. § 18-6-803.5(5) (2002).  Hence, even if an officer is mistaken in his or her determination that there is probable cause a domestic abuse restraining order is being violated, the officer will only be held liable in very

limited situations.  The passage of subsection (5) supports the legislature's goal

that officers be vigilant and consistent in enforcing restraining orders by relieving

them of any fear that an erroneous enforcement of restraining orders might result

in liability.  It also supports our conclusion that the state of Colorado fully

intended that the recipient of a domestic abuse restraining order have an

entitlement to its enforcement.[12]

---

[12]We reject Judge O'Brien's argument that Colorado's Government
Immunity Act (GIA), COLO. REV. STAT. §§ 24-10-101, *et seq.*, somehow casts a
shadow over Ms. Gonzales' ability to seek a constitutional remedy for the
officers' failure to enforce the restraining order.  By its terms, the GIA applies
only to state torts and has been strictly construed against the government "in the
interest of compensating victims of government negligence." *Springer v. City &
County of Denver*, 13 P.3d 794, 798 (Colo. 2000).  We have found no case in
which the GIA has been invoked to preclude or limit recovery in a § 1983
procedural due process action. *See, e.g., Hulen v. Yates*, 322 F.3d 1229 (10th Cir.
2003) (analyzing property interest created by contract with state without
considering whether GIA limits remedies); *Langley v. Adams County*, 987 F.2d
1473 (10th Cir. 1993) (same regarding property interest in employment); *Clouser
v. City of Thornton*, 676 F. Supp. 228 (D. Colo. 1987) (same); *Montoya v. City of
Colorado Springs*, 770 P.2d 1358 (Colo. Ct. App. 1989) (same); *Dickey v. Adams
County Sch. Dist. No. 50*, 773 P.2d 585 (Colo. Ct. App. 1989) (same).  Rather,
case law indicates the GIA has consistently been applied only to Colorado state
tort law claims against government officials even when the case also includes a §
1983 claim. *See, e.g., Robinson v. City & County of Denver*, 39 F. Supp. 2d 1257
(D. Colo. 1999) (state tort claims against public entity barred by GIA but § 1983
claims proceeded); *Erickson v. Board of County Comm'rs*, 801 F. Supp. 414 (D.
Colo. 1992) (§ 1983 claims analyzed separately from GIA impact on state tort
claims); *Stump v. Gates*, 777 F. Supp. 808 (D. Colo. 1991) (same).  The court in
*Ruegsegger v. Jefferson County*, 197 F. Supp. 2d 1247, 1265-66 (D. Colo. 2001),
explained why this is so:

> Constitutional claims are derived from rights created by a written
> constitution.  In contrast, tort claims generally are based on common

(continued...)

-30-

Our conclusion that the domestic abuse restraining order, whose enforcement is mandated by statute, creates a constitutionally protected entitlement, is supported by case law from other jurisdictions. As the panel opinion for this case noted:

> [I]n *Siddle v. City of Cambridge,* 761 F.Supp. 503 (S.D.Ohio 1991), the court concluded that a protective order obtained pursuant to state law "creates a property right which incurs a duty on the part of the government." *Id.* at 509. The state statute there provided that "any officer of a law enforcement agency *shall* enforce a protection order issued . . . by any court in this state in accordance with the provisions of the order." OHIO REV. CODE ANN. § 3113.31(F)(3) (West 2002) (emphasis added). The court observed that holders of protective orders are entitled to greater rights than other citizens and that such an order "would have no valid purpose unless a means to enforce it exists." *Siddle,* 761 F.Supp. at 509.

---

[12](...continued)
law principles developed through case authority. Thus, like a federal constitutional claim, a claim based on the Colorado Constitution does not lie in tort. Therefore, CGIA immunity does not attach to [a claim for violation of the state constitution].
*Id.*

Nor was the GIA invoked or cited by defendants in this case to undermine the validity of Ms. Gonzales' claim. Rather, defendants cite to the GIA as providing Ms. Gonzales with a civil remedy for the officer's failure to enforce the restraining order. *See* Aplt. Br. at 28 n.7 ("Under the Colorado Governmental Immunity Act, §§ 24-10-101, *et seq.*, 7B C.R.S. (2002), a party claiming injury could bring a tort claim against a law enforcement officer by alleging 'willful and wanton' conduct, essentially synonymous with the requirement of 'bad faith or malice' set forth within § 18-6-803.5(5), 6 C.R.S. (2002). *See* Colo. Rev. Stat. § 24-10-118 (2002)."). 
    The GIA tells us nothing about whether Colorado intended by the statute before us to support the constitutionally protected entitlement of enforcement possessed by recipients of a domestic abuse restraining order.

-31-

*Gonzales*, 307 F.3d at 1264. Likewise, as we noted earlier, in *Coffman* the court concluded that the mandatory language in the restraining order itself, rather than the state statute which contained permissive language, created a "property interest in police enforcement that is cognizable under *Roth*." *Coffman*, 739 F. Supp. at 264. "An order of court, served upon the [police] Department, that states that the Department shall enforce the order is unambiguous. The word 'shall' is mandatory, not precatory, and its use in a simple declarative sentence brooks no contrary interpretation." *Id*. *See also Campbell*, 682 A.2d at 274 (individual officers had duty in state negligence action to enforce restraining order where statute mandated officers arrest violator of order); *Nearing*, 670 P.2d at 140-42 (same).

Thus, the specific government benefit Ms. Gonzales claims, the government service of enforcing the objective terms of the court order protecting her and her children against her abusive husband, fits within the other types of *Roth* entitlements acknowledged by the Supreme Court and is properly deemed a property interest. Police enforcement of the restraining order, like a free education, *Goss*, 419 U.S. at 574, continued utility service, *Memphis Light*, 436 U.S. at 11-12, and welfare or disability benefits, *Goldberg*, 397 U.S. at 261-62; *Mathews*, 424 U.S. at 332, is a government benefit to which Ms. Gonzales and her daughters had a legitimate claim of entitlement. The state court's issuance of the restraining order to Ms. Gonzales, containing mandatory language and specific

-32-

objective criteria curtailing the decisionmaking discretion of police officers,

clearly commanded that the domestic abuse restraining order be enforced. The

mandatory statute, its legislative history, and the grant of immunity to officers for

the erroneous enforcement of restraining orders provides added weight to our

conclusion. For us to hold otherwise would render domestic abuse restraining

orders utterly valueless.[13]

---

[13]We disagree with Judge McConnell's assertions that our holding would allow unsuccessful substantive due process litigants to transform their claims into procedural due process challenges. Judge McConnell is correct to note that a procedural due process claim "is based on 'a denial of fundamental procedural fairness,' while a substantive claim is based on the 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" Dissent, McConnell, J., at 3 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)). However, contrary to Judge McConnell's contentions, Ms. Gonzales is not alleging that the officers' denial of her enforcement rights arose out of unjustified governmental action. Rather, her claim is that it was procedurally unfair for the police arbitrarily to decline to perform duties required of them pursuant to a mandatory court order which provided her a substantive property right under state law, and pursuant to a state statute commanding the same. Moreover, Ms. Gonzales is not asserting she has a right in the rare air to specific police action. *Cf. DeShaney*, 489 U.S. at 195 (due process clause, on its own, does not require "the State to protect the life, liberty, and property of its citizens against invasion by private actors"); *Doe by Fein*, 93 F.3d at 868-69 (statute outlining procedures cannot alone create protected interest); *Doe by Nelson*, 903 F.2d at 502-03 (same). Rather, pursuant to her restraining order and COLO. REV. STAT. § 18-6-803.5(3), the state of Colorado gave Ms. Gonzales a protected interest in police enforcement action. Hence, her case clearly falls within the rubric of procedural due process and should be analyzed as such. Contrary to Judge McConnell's suggestion, it would be entirely inappropriate to employ *Lewis*' "shocks the conscience" test in this case, as that test applies to substantive due process violations. *See Lewis*, 523 U.S. at 854.

Likewise, we find inapposite Judge McConnell's citation to *Reno v. Flores*,

(continued...)

"It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Roth*, 408 U.S. at 577. There can be no doubt Ms. Gonzales and her daughters relied on the enforcement of the restraining order to go about their daily lives. Nor can there be any doubt, if the alleged facts are proven, that their reliance was arbitrarily undermined by the officers' failure to enforce the restraining order, resulting in an unspeakably tragic outcome.

**B**

Having established that Ms. Gonzales has a protected interest in the enforcement of the restraining order, we must now turn our focus to whether Ms.

---

[13](...continued)
507 U.S. 292 (1993), to illustrate his proposition that Ms. Gonzales is merely trying to recharacterize a substantive due process claim into a procedural due process one. In *Flores*, the Court first determined that illegal immigrant juveniles did not have a substantive due process liberty interest, pending a deportation hearing, to be released to someone other than a family member or legal guardian. *Id*. at 302-03. Because the juveniles had no liberty interest, their facial challenge to allegedly flawed INS procedures could not support their asserted procedural due process claims. *Id.* at 308-09. In contrast to the plaintiffs in *Flores*, Ms. Gonzales possesses a protected interest in the enforcement of the restraining order as granted by the state. Nor is she challenging the substance of COLO. REV. STAT. § 18-6-803.5(3), which provides guidance to officers as to the process they should employ when determining whether to enforce a restraining order. *See infra*, section B. Therefore, *Flores* is inapplicable here.

Gonzales has stated a claim that she was denied "an appropriate level of process."

*Farthing*, 39 F.3d at 1135.[14]

> The due process clause of the Fourteenth Amendment
>
> raises no impenetrable barrier to the taking of a person's possessions. But the fair process of decision making that it guarantees works, by itself, to protect against arbitrary deprivation of property. For when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented.

*Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). "The 'right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society.' The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring) and *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). A meaningful hearing protects an individual's

> use and possession of property from arbitrary encroachment [and] minimize[s] substantively unfair or mistaken deprivations of property . . . . So viewed, the prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference.

---

[14]Because the district court dismissed Ms. Gonzales' procedural due process claim based on its conclusion that she did not possess a protected property right, it did not reach the second prong of the procedural due process analysis, that is, what process is due.

*Fuentes*, 407 U.S. at 81. Based on the allegations in Ms. Gonzales' complaint, she did not receive any process whatsoever prior to the deprivation of her interest in enforcement of the restraining order. Instead, the officers repeatedly ignored and refused her requests for enforcement.[15]

The city and officers challenge the contention that Ms. Gonzales should have been afforded some form of process prior to their non-enforcement of the restraining order. They claim Ms. Gonzales' action against them is precluded by

---

[15]Judge McConnell contends that even if Ms. Gonzales has a protected interest in enforcement of the restraining order, her due process claim must nonetheless be classified as substantive rather than procedural. In seeking to distinguish this case from other procedural due process cases, Judge McConnell states that those cases "did not hinge, as here, on whether the results were justified, but on whether the plaintiffs had the opportunity to be heard by the appropriate officials." Dissent, McConnell, J., at 7 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982); *Memphis Light*, 436 U.S. at 5; *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Barry v. Barchie*, 443 U.S. 55 (1975); *Goss v. Lopez*, 419 U.S. 565 (1975); *Perry v. Sinderman*, 408 U.S. 593 (1972); *Bd. of Regents v. Roth*, 408 U.S. 564 (1972); *Bell v. Burson*, 402 U.S. 535 (1971); *Goldberg*, 397 U.S. at 255; *Sniadach v. Family Fin. Corp.*, 395 U.S. 337 (1969)). We disagree.

Beyond question, the results in this case were devastating. However, the issue which we address here is whether the process by which the officers reached their decision not to enforce the restraining order was arbitrary and fundamentally unfair. *Cf. Lewis*, 523 U.S. at 845-46. Hence, as in the cases where the plaintiffs felt they were arbitrarily denied the right to bring a legal action, *Logan*, 455 U.S. at 426-27, to attend public school, *Goss*, 419 U.S. at 568-69, to enjoy tenured employment, *Perry*, 408 U.S. at 595, to possess a business or driver's license, *Barry*, 443 U.S. at 63-64; *Bell*, 402 U.S. at 536, or to receive utility services, disability benefits, or welfare benefits, *Memphis Light*, 436 U.S. at 5; *Mathews*, 424 U.S. at 322; *Goldberg*, 397 U.S. at 255, this case challenges *the manner* by which the police allegedly deprived Ms. Gonzales of her interest in enforcement of the restraining order.

*Parratt v. Taylor*, 451 U.S. 527, 537 (1981), *overruled on other grounds by*

*Daniels v. Williams*, 474 U.S. 327 (1986), which they cite for the proposition that

even if a protected property right existed, the

> necessity of quick action by the State or the impracticality of
> providing any meaningful predeprivation process, when coupled with
> the availability of some meaningful means by which to assess the
> propriety of the State's action at some time after the initial taking
> satisf[ies] the requirements of procedural due process.

Aple. Br. at 27 (citing *Parratt*, 451 U.S. at 539). They specifically assert

> there is no practical pre-deprivation process under § 18-6-803.5(3)
> . . . which can be afforded to the holder of a restraining order. The
> only conceivable scenario would be to require law enforcement to
> provide notice of a hearing to the recipient and later entertain a
> hearing to determine if probable cause exists to believe that the
> restraining order has been violated.

*Id.* at 28. They also contend an adequate post-deprivation remedy exists.

Consequently, they aver that Ms. Gonzales' claims cannot proceed.

> We completely disagree. First,

> [i]f the right to notice and a hearing is to serve its full purpose, then,
> it is clear that it must be granted at a time when the deprivation can
> still be prevented. . . . [N]o later hearing and no damage award can
> undo the fact that the arbitrary taking that was subject to the right of
> procedural due process has already occurred. "This Court has not . . .
> embraced the general proposition that a wrong may be done if it can
> be undone."

*Fuentes*, 407 U.S. at 81-82 (citing *Stanley v. Illinois*, 405 U.S. 645, 647 (1972)).

Second, the city and officers' reliance on *Parratt* is misplaced.

Under *Parratt*, a plaintiff cannot raise a § 1983 procedural due process

claim where the loss of property resulted from the random and unauthorized

actions of a state actor which made the provision of pre-deprivation process impossible or impracticable, and an adequate state post-deprivation remedy exists. *Parratt*, 451 U.S. at 540-41, 543. *See also Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available"). Conversely, when the deprivation is caused by established state procedures, the existence of an adequate remedy at state law does not extinguish a procedural due process claim. *See Logan*, 455 U.S. at 435-37. *See also Zinermon v. Burch*, 494 U.S. 113, 136-39 (1990).

In *Logan*, the Court held that the plaintiff suffered a procedural due process violation because established state procedures erroneously deprived him of his property interest in bringing a cause of action. *Logan*, 455 U.S. at 437. The Court distinguished the case from *Parratt*, noting that the plaintiff's deprivation was not random and unauthorized, but instead the result of an "'established state procedure' that destroy[ed] his entitlement without according him proper procedural safeguards." *Id.* at 436.

Of primary importance here, Ms. Gonzales alleges that her deprivation was not the result of random and unauthorized behavior by the individual officers. Rather, she asserts the deprivation was the result of a custom and policy of the

City of Castle Rock not to enforce domestic abuse protective orders. In accordance with *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978),

> [l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, . . . local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. . . . "Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute 'custom or usage' with the force of law."

*Monell*, 436 U.S. at 690-91 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). *See also Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1249 (10th Cir. 1999) ("Absent . . . an official policy, a municipality may also be held liable if the discriminatory practice is so permanent and well settled as to constitute a custom or usage with the force of law.") (quotations omitted). A municipality may also be liable for the "actions of an employee who is not a final policymaking authority if a widespread practice exists to the end that there is a custom or usage with the force of law." *Sauers v. Salt Lake County*, 1 F.3d 1122, 1129 (10th Cir. 1993) (quotation omitted); *see also Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).

Accepting as true the well-pleaded facts in Ms. Gonzales' complaint, and making all reasonable inferences in her favor, *Ruiz*, 299 F.3d at 1181, Ms.

-39-

Gonzales has stated a claim of municipal liability against the City of Castle Rock for the deprivation of her property interest without procedural due process. She alleges that "the City of Castle Rock, through its police department, has created an official policy or custom of failing to respond properly to complaints of restraining order violations" and "the City's police department maintains an official policy or custom that recklessly disregards a person's rights to police protection with respect to protective orders, and provides for or tolerates the non-enforcement of protective orders by its police officers . . . ." Aplt. Appx. at 12.[16] Based on these allegations, Ms. Gonzales has asserted that the deprivation of her property right was not the result of random and unauthorized acts, but instead was pursuant to an official policy or custom of the city. Just as the plaintiff in *Logan* could not be deprived of his property right by a defective state procedure that afforded him no process, neither may Ms. Gonzales' property right be denied by the city's alleged custom of refusing to enforce restraining orders. In concert with *Logan*, and based on Ms. Gonzales' complaint against the City of Castle Rock and the individual officers, her procedural due process claims are therefore not precluded by *Parratt*.

---

[16] Ms. Gonzales also alleges the city is liable for its failure to train officers "as to how they should respond to complaints of restraining order violations . . . ." Aplt. Appx. at 12.

Courts dealing with the convergence of *Monell* claims and *Parratt* defenses

have held accordingly. For example, in *Brooks v. George County*, 84 F.3d 157

(5th Cir. 1996), the court held that

> [w]here a municipal officer operates *pursuant to a local custom or procedure*, the *Parratt/Hudson* doctrine is inapposite: actions in accordance with an "official policy" under *Monell* can hardly be labeled "random and unauthorized," . . . . [W]here employees are acting in accord with customary procedures, the "random and unauthorized" element required for the application of the *Parratt/Hudson* doctrine is simply not met.

*Id.* at 165 (citations omitted). Likewise, in *Wilson v. Civil Town of Clayton*, 839

F.2d 375 (7th Cir. 1988), the court stated:

> [w]hen it is the Town itself that is being sued, and the suit is allowed under *Monell* because the action was executed in accordance with "official policy," the tortious loss of property can never be the result of a random and unauthorized act. Therefore, a complaint asserting municipal liability under *Monell* by definition states a claim to which *Parratt* is inapposite.

*Wilson*, 839 F.2d at 380. *See also Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th

Cir. 1991) (when plaintiff brings municipal liability action claiming established

state procedures deprived him of property interest, *Parratt* not applicable);

*Matthias v. Bingley*, 906 F.2d 1047, 1058 (5th Cir. 1990) ("rationale of *Parratt*

. . . does not apply when the challenged actions comply with City policy");

*Sullivan v. Town of Salem*, 805 F.2d 81, 86 (2d Cir. 1986) (if conduct of official

was pursuant to town policy, *Parratt* not applicable); *Sanders v. Kennedy*, 794

F.2d 478, 482 (9th Cir. 1986) (*Parratt* does not apply in § 1983 action against

individual officers and chief of police where plaintiff alleged property damage

incurred during course of arrest was result of official policy, practice or custom);

*McKee v. Heggy*, 703 F.2d 479, 482-83 (10th Cir. 1983) (where record suggested

plaintiff's seized car was sold by police department pursuant to customary

procedures treating seized vehicles as abandoned, city could be held liable for

violation of procedural due process claims).

Thus, when the issue is a deprivation resulting from a municipal policy, not

the random acts of rogue officers, neither the city nor individual officers can seek

refuge under *Parratt*. *See Matthias*, 906 F.2d at 1058 (city not shielded by

*Parratt* from § 1983 liability for acts in compliance with city policy); *McKee*, 703

F.2d at 482-83 (same); *Amons v. Dist. of Columbia*, 231 F. Supp. 2d 109, 114

(D.D.C. 2002) (same); *Brooks*, 84 F.3d at 165-66 (individual officers sued in

individual and official capacities may not rely on *Parratt* where deprivation is

result of local custom or procedure); *Alexander v. Ieyoub*, 62 F.3d 709, 712-13

(5th Cir. 1995) (same); *Sullivan*, 805 F.2d at 86 (same). Therefore, the assertions

of the city and officers that pre-deprivation process was impossible and post-

deprivation proceedings adequate are inapposite here.

The district court dismissed Ms. Gonzales' complaint as deficient under

FED. R. CIV. P. 12(b)(6). We thus have no record of what the police actually did

or considered, or of what the City's policy actually is. In general, however, we

note that "due process is flexible and calls for such procedural protections as the

particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In *Mathews*, the Supreme Court highlighted the "truism that '[d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews*, 424 U.S. at 334 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). "The hearing 'need not be elaborate;' indeed, 'something less than a full evidentiary hearing is sufficient.'" *Benavidez v. City of Albuquerque*, 101 F.3d 620, 627 (10th Cir. 1996) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985)). For example, in *Memphis Light*, 436 U.S. at 16 & n.17, the Supreme Court held due process satisfied when prior to the termination of utility services, the customer had an opportunity to informally consult with and present her case to a designated employee of the company who had authority to correct any billing mistakes. Likewise, in *Goss* the Court held that before a student could be suspended from school, he had to

> be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these *rudimentary precautions* against unfair or mistaken findings of misconduct and arbitrary exclusion from school.

*Goss*, 419 U.S. at 581 (emphasis added).

Judge McConnell implies that Ms. Gonzales did receive some form of a hearing from the officers and hence her complaint cannot be construed as

challenging the lack of process she received, but, instead, is a challenge to the results of that hearing. Dissent, McConnell, J., at 6. We wholly disagree that Ms. Gonzales' repeated phone calls to the police department and the officers' seemingly outright dismissal of her claims constitutes "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333. According to Ms. Gonzales' complaint, in effect no one was listening.

In specifically determining what process is due a plaintiff, a court must balance

> three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. *See also Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001); *Clark v. City of Draper*, 168 F.3d 1185, 1189 (10th Cir. 1999). Although the balancing test required by *Mathews* cannot be undertaken without a developed record, we note that the likelihood here of serious loss is patently evident by the very facts of this case, the murder of children the order was obtained to protect. *See Mathews*, 424 U.S. at 335. If the "discontinuance of water or heating even for short periods of time may threaten health and safety," thereby requiring pre-deprivation process, *Memphis Light*, 436 U.S. at 18, certainly one's interest in the

enforcement of a domestic abuse protective order must be deemed equally vital. *See also Bell*, 402 U.S. at 539 (possession of driver's license "essential in the pursuit of a livelihood" and cannot be denied without pre-deprivation process); *Goldberg*, 397 U.S. at 263 (discontinuation of welfare benefits constitutes "grievous loss" meriting pre-deprivation process). Moreover, if it should turn out the officers repeatedly ignored and denied Ms. Gonzales' requests for enforcement, it follows that no procedures of any form were employed to minimize the risk of erroneous deprivation, *see Mathews*, 424 U.S. at 335 (court must examine "risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards"), resulting in what can only be described as the arbitrary denial of a protected interest. *See Lewis*, 523 U.S. at 845-46. Clearly then, additional procedural safeguards could have prevented the risk of erroneous deprivation of Ms. Gonzales' protected interest.

Applying the *Mathews* analysis to the allegations here, it is apparent that the restraining order enforcement statute provides direction in answering the question of what additional procedural safeguards could have been employed by the police officers. *See* COLO. REV. STAT. § 18-6-803.5. In our earlier discussion, we held the restraining order's specific terms, mandatory language, and objective predicates limiting decision maker discretion, created a protected

property interest in the enforcement of the domestic abuse protective order granted to Ms. Gonzales. The statute, while absent the specificity of the restraining order, nonetheless guides officers as to the process they should provide a holder of a restraining order before depriving that individual of his or her enforcement rights.

The statute directs police officers to determine whether a valid order exists,[17] whether probable cause exists that the restrained party is violating the order, *see* COLO. REV. STAT. § 18-6-803.5(3)(b)(I), and whether probable cause exists that the restrained party has notice of the order. *See* COLO. REV. STAT. § 18-6-803.5(3)(b)(II).[18] If, after completing these three basic steps, an officer finds the restraining order does not qualify for mandatory enforcement, the person claiming the right should be notified of the officer's decision and the reason for it.

These steps, while admittedly abbreviated, appropriately acknowledge the exigent circumstances which accompany a request to enforce a domestic abuse

---

[17]This task can be accomplished by either examining the order in person, or by checking to see if the order has been entered in the statewide registry of protective orders. *See* COLO. REV. STAT. § 18-6-803.7 (creating central registry of protective orders issued in Colorado).

[18]In making these determinations, the statute states "a peace officer shall assume that the information received from the registry is accurate. A peace officer shall enforce a valid restraining order whether or not there is a record of the restraining order in the registry." COLO. REV. STAT. § 18-6-803.5(3)(c).

protection order and are sufficiently flexible to meet the demands of that particular situation. *See Morrissey*, 408 U.S. at 481. While this procedure obviously does not provide Ms. Gonzales with the opportunity for a full court hearing, it is not essential that it does so. *See Benavidez*, 101 F.3d at 627 (something less than full evidentiary hearing can be sufficient to satisfy procedural due process). Regardless of its brevity, the procedure provides the opportunity to present a request for enforcement to the police and to have it adequately and sufficiently examined prior to any official decision to deny enforcement. Of equal importance, if followed, the process would minimize the risk of the arbitrary, erroneous or mistaken deprivation of an individual's right to have a protection order enforced. *Mathews*, 424 U.S. at 335. By completing the three steps laid out in the statute, the wrongful denial of Ms. Gonzales' right could have been prevented, and three lives potentially spared.

Nor does the identified procedure amount to a substantial burden upon the interests of police departments and municipalities. Indeed, the process would only take minutes to perform, and includes tasks officers regularly perform in the course of their daily duties. Under the balancing test required by *Mathews*, and reading the allegations of Ms. Gonzales' complaint in the light most favorable to her, we therefore determine the scales tip in her favor. Ms. Gonzales' interest in having the restraining order enforced was substantial, and without question the

officers' alleged failure to provide her with any meaningful process prior to refusing to enforce the court order erroneously deprived her of her protected entitlement. Moreover, the use of additional safeguards would have certainly aided in preventing the risk of wrongful deprivation. Finally, requiring the officers to engage in this three step process prior to depriving an individual of her enforcement rights is hardly an unreasonable burden to place on the police.

In sum, we conclude that the process set up in the statute was that the police must, in timely fashion, consider the merits of any request to enforce a restraining order and, if such a consideration reveals probable cause, the restrained person should be arrested. Here, Ms. Gonzales alleges that due to the city's policy and custom of failing to properly respond to complaints of restraining order violations, she was denied the process laid out in the statute. The police did not consider her request in a timely fashion, but instead repeatedly required her to call the station over several hours. The statute promised a process by which her restraining order would be given vitality through careful and prompt consideration of an enforcement request, and the constitution requires no less. Denial of that process drained all of the value from her property interest in the restraining order.

If one considers that constitutional process includes a right to be heard, Ms. Gonzales was deprived of that process because, according to her allegations, the

police never "heard" nor seriously entertained her request to enforce and protect her interests in the restraining order. Alternatively, if one considers that the process to which she was entitled was a bona fide consideration by the police of a request to enforce a restraining order, she was denied that process as well. According to Ms. Gonzales' allegations, the police never engaged in a bona fide consideration of whether there was probable cause to enforce the restraining order. Their response, in other words, was a sham which rendered her property interest in the restraining order not only a nullity, but a cruel deception.

Based on the well-pleaded facts of Ms. Gonzales' complaint, we hold that she has adequately stated a procedural due process claim upon which relief can be granted. She had a property interest in the enforcement of the restraining order which was allegedly taken from her without due process of law. Her § 1983 action can therefore proceed.


**III**

We must next address whether the individual officers, acting pursuant to the official policy or custom of the City of Castle Rock, were entitled to the defense of qualified immunity. *Sullivan*, 805 F.2d at 87. Under the doctrine of qualified immunity, a government actor is not subject to liability unless it is "sufficiently clear that a reasonable official would have understood that his

conduct violated the right." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir.), *cert. denied*, 534 U.S. 1019 (2001). *See also Lybrook v. Members of the Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000); *Liebson v. N. M. Corr. Dep't*, 73 F.3d 274, 276 (10th Cir. 1996).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier*, 242 F.3d at 923 (citing *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)). In the instant case, we cannot hold that a reasonable officer would have known that a restraining order, coupled with a statute mandating its enforcement, would create a constitutionally protected property interest. No Supreme Court or Tenth Circuit case has so held. Nor have we found any other circuit court cases addressing this specific question. Somewhat analogous cases from the Sixth and Eleventh Circuits have held that comprehensive state child welfare statutes created liberty interests in personal safety and the freedom from harm which gave rise to procedural due process protections. *See Meador v. Cabinet for Human Res.*, 902 F.2d 474, 476 (6th Cir. 1990); *Taylor v. Ledbetter*, 818 F.2d 791, 799 (11th Cir. 1987) (en banc). Likewise, two district courts, addressing facts similar to those in the present case, held that protective orders or their supporting statutes created a property interest

-50-

in enforcement. *See Siddle*, 761 F. Supp. at 509; *Coffman*, 739 F. Supp. at 264. Nevertheless, this precedent is insufficient to clearly establish the law for this circuit. Officers Ahlfinger, Brink and Ruisi are thus entitled to the affirmative defense of qualified immunity.

The same cannot be said for the City of Castle Rock. It is well established that municipalities cannot avail themselves of the qualified immunity doctrine. *See Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993); *Dill v. City of Edmond*, 155 F.3d 1193, 1212 (10th Cir. 1998). Ms. Gonzales can proceed with her § 1983 action against the city.

**IV**

Accordingly, we **REVERSE** the district court's dismissal of Ms. Gonzales' procedural due process claim, and **REMAND** for further proceedings in accordance with this opinion.

No. 01-1053, *Gonzales v. City of Castle Rock*

**KELLY,** Circuit Judge, joined by **TACHA**, Chief Circuit Judge, and **O'BRIEN**, Circuit Judge, concurring in part and dissenting in part.

The facts of this case give new meaning to the old adage that hard cases make bad law. I understand this court's desire to fashion a cause of action to remedy what charitably could be described as gross negligence. However, I do not agree that the Fourteenth Amendment elevates what is essentially a case of negligence by a state actor into a constitutional violation. Accordingly, I respectfully dissent from the court's constitutionalization of state law.

I agree that the individual officers are entitled to qualified immunity, but disagree that a protected property interest exists "in the enforcement of the terms of [a] restraining order." Ct. Op. at 14. The court reaches its conclusion based upon the restraining order and the Colorado statutes upon which it is based, particularly Colo. Rev. Stat. § 18-6-803.5(3) (2002). Colorado has enacted a statute making it a misdemeanor to knowingly violate a protective order, and then specified peace officers' and prosecutors' non-exclusive duties in enforcing the statute as well as the protective order itself. Colo. Rev. Stat. § 18-6-803.5(1)–(3); People v. Coleby, 34 P.3d 422, 424 (Colo. 2001). A protected person may also initiate contempt proceedings against one who violates a restraining order. Colo. Rev. Stat. § 18-6-803.5(7).

This court retreats from the holding of the panel opinion that the **statute**, by its use of objective predicates and seemingly mandatory outcomes, creates a

property interest in the enforcement of a protective order by every reasonable means, including arrest whenever probable cause exists to believe the restrained person has violated the order. Gonzales v. City of Castle Rock, 307 F.3d 1258, 1265-66 (10th Cir. 2002). Instead, the court holds that the property interest derives from the **protective order** that is issued by a court pursuant to the statute. Ct. Op. at 21 n.9. This is largely a distinction without a difference, for the same statutory provisions the panel opinion relied upon are repeated in the protective order.[1] Moreover, the protective order binds the parties to it; it cannot bind the peace officers who are non-parties.

A. Judicial Notice

The court issues its pronouncement by taking judicial notice on appeal (and then supplementing the record with) of the back of a restraining order form. Obviously, when reversing a district court, we should hesitate to take judicial notice of (or supplement the record with), ostensibly dispositive materials not before the district court.

B. Due Process

The panel decision correctly rejected the substantive due process claims on the authority of DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989), which held "that a State's failure to protect an individual against

---

[1] At best, they are repeated as notice provisions, they are not included in the decretal paragraphs of the order.

private violence simply does not constitute a violation of the Due Process Clause," id. at 197, absent a special relationship between the State and the victim or some role of the State in creating the danger. Gonzales, 307 F.3d at 1262-63; see also Duong v. County of Arapahoe, 837 P.2d 226, 229 (Colo. Ct. App. 1992) (rejecting claim that county defendants breached a constitutional duty by failing to protect wife from husband where a permanent restraining order had been issued and the judge specifically requested security) (citing Estate of Gilmore v. Buckley, 787 F.2d 714 (1st Cir. 1986)[2]). Neither exception applies in this case, and although the facts alleged plainly state a claim for gross negligence, not every common law duty supports a federal due process violation.

---

[2] In rejecting a substantive due process claim on grounds anticipating DeShaney, the First Circuit cautioned against "an expansive guarantee of state protective services." Estate of Gilmore, 787 F.2d at 720.

> Enormous economic consequences could follow from the reading of the fourteenth amendment that plaintiff here urges. Firemen who have been alerted to a victim's peril but fail to take effective action; municipal ambulances which, when called, arrive late; and myriad other errors by state officials in providing protective services, could all be found to violate the Constitution. It would seem appropriate that the citizenry, acting though state legislatures and state courts, should determine how far it wishes to go in reimbursing claims of this type. We can see no justification for rewriting the due process clause of the federal Constitution so as to construct a basis for relief that can more flexibly be provided elsewhere, if that is deemed advisable.

Id. at 722-23. The same can be said about employing procedural due process to create an expansive guarantee of state protective services.

-3-

The Plaintiff, however, invokes a different source of due process protection by claiming a property interest in the enforcement of her protective order, which she argues could not be deprived without an opportunity to be heard. However improbable it may be that Ms. Gonzales sought only a hearing on the decision not to enforce the protective order–rather than enforcement itself–I take her argument at face value and analyze her case under our procedural due process precedents.[3] Defendants argue that the panel's decision on the procedural due process claim is discordant with DeShaney because "a private individual need not have a special relationship with the state, nor must he show the state created or enhanced the danger to establish a Fourteenth Amendment violation . . . . Instead, the individual only need cite a state law containing mandatory language and then assert that a property interest has been denied without the benefit of procedural due process." Aplees. Reh'g Br. at 6. Given that this statute primarily sets out a criminal offense and then contains procedure on how the offense is to be prosecuted, I agree.

In Board of Regents v. Roth, 408 U.S. 564, 569-71 (1972), the Supreme Court held that the procedural due process requirements of the Fourteenth Amendment apply only where the particular interest at stake falls within the Amendment's protection of liberty or property. Acknowledging that the property

---

[3] I join the dissents of Judges O'Brien, McConnell and Hartz which recognize this problem.

interests protected by procedural due process "extend well beyond actual ownership of real estate, chattels, or money," the Court stated that it has "at the same time observed certain boundaries. For the words 'liberty' and 'property' in the Due Process Clause . . . must be given some meaning." Id. at 572. The Court went on to define a property interest as an interest "that a person has already acquired in *specific* benefits." Id. at 576 (emphasis added). Moreover, the Court added that to have a property interest in a benefit, the individual claiming the interest "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id. at 577.

From Roth, it is apparent that the test for determining whether an interest in a benefit constitutes "property" for due process purposes consists of two distinct elements. First, that benefit must be specific, and second, the individual claiming the interest must have a legitimate claim of entitlement to the benefit. It has always been the law that mere procedure contained in a statute does not create a property interest–were it otherwise every statute prescribing procedure would confer procedural due process rights. See Olim v. Wakinekona, 461 U.S. 238, 250-51 (1983).

The panel opinion determined that a portion of the statute, Colo. Rev. Stat. § 18-6-803.5(3), goes beyond establishing mere procedural guidelines, and instead contains mandatory directives to enforce protective orders if certain substantive

conditions are fulfilled. Gonzales, 307 F.3d at 1264-66. The court now focuses on those same mandatory directives as contained in the protective order. It concludes by negative inference that the failure to enforce the protective order results in a denial of a property interest for which due process protections are required. See Sandin v. Connor, 515 U.S. 472, 480-81 (1995); Hewitt v. Helms, 459 U.S. 460, 472 (1983); Cosco v. Uphoff, 195 F.3d 1221, 1223 (10th Cir. 1999). Even though the court has shifted its primary focus from the statute to the protective order, the statute very much matters because the form protective order contains a notice provision (on the back) that essentially repeats the statute.

Where an individual claims a property or liberty interest based upon a state statute or regulation containing mandatory language, that language must "requir[e] that a particular result is to be reached upon a finding that the substantive predicates are met." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 464 (1989); see also Sandin, 515 U.S. at 481 (describing liberty interest under this approach as an enforceable expectation that mandatory language and substantive predicates "would produce a particular outcome"). Where discretion is not limited, the language is not mandatory for purposes of this analysis, and a property or liberty interest is not created. See Olim, 461 U.S. at 249-50 (no liberty interest in limiting prison transfers where regulations described procedure but did not place substantive limits on discretion). Stated another way, if a

-6-

particular result is not *required*, no liberty or property interest is created.  <u>See</u>

<u>Thompson</u>, 490 U.S. at 464.

When the statute is viewed as a whole, it is apparent that it does not require a particular result in every case and necessarily involves discretion.  This is a criminal statute that not only defines the crime of violation of a protective order, but also specifies how enforcement, including arrest and prosecution, may occur.   A general directive in subsection 3(a) requires that "[a] peace officer shall use every reasonable means to enforce a restraining order."  Colo. Rev. Stat. § 18-6-803.5(3)(a).  Enforcement of a protective order at this level is necessarily procedural–peace officers do not decide guilt or innocence, nor do they confer substantive benefits, including the right to be free of the activities proscribed by the statute.  <u>See</u> <u>id.</u>  Subsection 3(b) then elaborates on but one means of enforcement–arrest–and then contains a totally unremarkable probable cause requirement.  <u>Id.</u> § 18-6-803.5(3)(b).  It requires a peace officer to arrest a restrained person on probable cause that a protective order is being violated and the restrained person has notice of the order.  <u>Id.</u>  Even then it gives discretion to an officer to merely seek a warrant "if an arrest would be impractical under the circumstances."  <u>Id.</u>   The statute acknowledges means of enforcement other than arrest.  <u>See</u> <u>id.</u> § 18-6-803.5(5) (containing an exculpatory provision for a peace officer "arresting a person for violating a protection order *or otherwise enforcing*

-7-

*a protection order*") (emphasis added).  At best, these provisions are specifications of procedure, not the creation of substantive rights inuring to the benefit of protected persons.

While the statute may channel the discretion of law enforcement, it in no way eliminates that considerable discretion for obvious reasons.  As the panel noted, "an arrest is not always necessary to enforce a restraining order."  Gonzales, 307 F.3d at 1265.  It all  depends upon the circumstances.  Intervention short of an immediate arrest may be more effective, safer and more efficient for the protected person and law enforcement.  Moreover, an arrest or an arrest warrant is influenced by other discretionary factors apart from probable cause, including the well-being of the protected person, the peace officer, the restrained person and the community.  Whether we define the interest as "reasonable means to enforce a protection order," Colo. Rev. Stat. § 18-6-803.5(3)(a), or "in terms of a reasoned police response or reasonable protection," Ct. Op. at 27, the conclusion is the same–these formulations deal with procedure and simply lack the concrete specificity necessary for a property interest.

Because of the varied circumstances that law enforcement officers confront, the Colorado legislature obviously did not prescribe arrest in all cases.  Bear in mind this  restraining order was issued ex parte, allowing the restrained party to move for its dissolution or modification on two days notice to the person

obtaining the order. App. 29; Colo. Rev. Stat. § 14-10-108(6). The restraining order was modified and made "permanent" in another temporary order not part of a final decree. App. 30. Colo. Rev. Stat. § 14-10-108(5)(b)–(c). Whether we call it "a property interest in the enforcement of the terms of [a] restraining order," Ct. Op. at 14, or a property interest in "the government service of enforcing the objective terms" of a protective order, id. at 32, the interest identified is too general. It cannot be reduced to definite outcomes, regardless of whether the court relies upon the statute or part of an order that provides notice of the statute's terms. It matters not that the restraining order was issued on a showing of irreparable injury and that it forbade Mr. Gonzales from molesting or disturbing the peace of any party or of any child as envisioned by the statute. App. at 29; Colo. Rev. Stat. 14-10-108(2)(b)–(c), (3). The cases recognizing property and liberty interests have dealt with particular and discrete outcomes where due process is required based upon state law. See Washington v. Harper, 494 U.S. 210, 221 (1990) (liberty interest in freedom from arbitrary administration of anti-psychotic medication); Hewitt, 459 U.S. at 471-72 (liberty interest in freedom from administrative segregation); Vitek v. Jones, 445 U.S. 480, 487-91 (1980) (liberty interest in freedom from an arbitrary, involuntary transfer to a mental hospital); Greenholtz v. Inmates of the Neb. Penal & Corr. Complex, 442 U.S. 1, 11-12 (1979) (liberty interest in parole); Wolff v.

McDonnell, 418 U.S. 539, 557-58 (1974) (liberty interest in avoiding loss of good time credits); Roth, 408 U.S. at 578 (potential property interest in re-employment for the next year); Goldberg v. Kelly, 397 U.S. 254, 260-61 (1970) (property interest in welfare benefits requiring pre-termination hearing). Enforcement of a protective order is different–it is necessarily case by case, influenced by a variety of decisionmakers and no single remedy would suffice. There just is not a certain outcome in which to have a legitimate expectation of entitlement. See Doe v. Hennepin County, 858 F.2d 1325, 1328 (8th Cir. 1988) ("To have an entitlement the benefit must be clearly definable; public assistance, social security or unemployment benefits are examples of such.").

As noted, although the court emphasizes the language contained in the protective order (against a backdrop of the statute), its analysis differs little from the panel opinion because both rely upon the statute's seemingly mandatory terms. See Ct. Op. at 21. If anything, the language in the protective order in effect complicates the analysis. First, the fact that the form of order contained a "Notice to Law Enforcement Officials" repeating the language of the statute does not eliminate the discretion of law enforcement. That section is preceded by a "Notice to Restrained Party" indicating "You *may* be arrested without notice if a law enforcement officer has probable cause to believe that you have knowingly violated this order." (emphasis added). This suggests law enforcement discretion.

-10-

Second, although a later temporary order makes the restraining order permanent, the later order modified the restraining order and specifically allowed parenting time for the father. Some of that time was with notice and consent, and some was without. Regardless, the order in effect plainly contemplated that the father was to have contact with the children on alternating weekends, at mid-week dinner visits arranged by the parties, and during two weeks of the summer. App. at 30-31. The statement that: "The restraining order here specifically directed, with only the narrowest of exceptions, that Mr. Gonzales stay away from Ms. Gonzales and her daughters," Ct. Op. at 23, is somewhat beside the point, as well as inaccurate, because the restraining order had been significantly modified when the incident occurred. Determining whether the father was in compliance with the order then in effect is not quite as obvious as the court portrays it to be.

Unlike a money judgment, a protective order is not collectable, transferable, or bankable. The temporary protective order here was not an adjudication of Ms. Gonzales's rights against the law enforcement officials or an enforceable agreement between them. Instead, as its caption indicates, the protective order was issued in favor of Ms. Gonzales to protect her and her children <u>from her husband</u>. <u>See</u> Colo. Rev. Stat. § 14-10-108(2) ("either *party* [spouse] may request the court to issue a temporary injunction . . . [e]njoining a *party* . . . [e]xcluding a *party* . . . .") (emphasis added).

The conclusion that Ms. Gonzales had a property interest in the enforcement of the terms of the protective order strongly implies that law enforcement was bound *by the order* also. This is untenable. For obvious reasons, the law is very specific when it comes to the legal effect of an injunction or temporary restraining order:

> **Form and Scope of Injunction or Restraining Order.** Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and *is binding only upon the parties to the action*, their officers, agents, servants, employees, and attorneys, *and upon those persons in active concert or participation with them* who receive actual notice of the order by personal service or otherwise.

Colo. R. Civ. P. 65(d) (emphasis added); <u>accord</u> Fed. R. Civ. P. 65(d). By operation of law, the defendants as non-parties were not bound by this temporary restraining order, nor could they be said to be acting in active concert or participation with either party in this case. The restraining order in this case cannot do service for a mandatory affirmative injunction that names the Defendants and the tasks they must accomplish. That Ms. Gonzales did not have an entitlement to action by law enforcement under the terms of the order is buttressed by Colorado's statutory recognition that the "violation of a protective order" is committed <u>not</u> by a failure of law enforcement to take specific action, but when a person subject to an order's provisions "contacts, harasses, injures,

-12-

intimidates, molests, threatens, or touches any protected person or enters or remains on premises or comes within a specified distance of a protected person or premises." Colo. Rev. Stat. § 18-6-803.5(1). Indeed, the back of the form also informs a *restrained party* that violation of such an order "will . . . constitute contempt of court," consistent with a remedy envisioned by the statute. See Colo. Rev. Stat. 18-6-803.5(7).

Thus I fully agree with Judge O'Brien:

Any process to which Ms. Gonzales was due based upon the decretal, and therefore enforceable, language of the TRO (and centuries of jurisprudence) has nothing to do with law enforcement officers. It is the right to an appropriate remedy against a contumacious party, judicially imposed after a hearing. That process was never denied Ms. Gonzales.

O'Brien, J., dissent at 9. The court rejects our observations about the limits of a restraining order as a source of constitutional tort liability as tantamount to suggesting "that police officers in Colorado are at liberty to ignore the terms of court orders, especially where such orders clearly direct police enforcement and are issued pursuant to legislation anticipating the same." Ct. Op. at 21 n.9. The court follows this with citations to cases illustrating that other states "have by no means sanctioned an officer's failure to enforce terms appearing in a restraining order and mandated by statute." Id. The cases all involve applications of state law (negligence or statutory negligence) and immunity defenses. Of course, police officers in Colorado are not at liberty to ignore the terms of statutes or

-13-

court orders, but whether *state* tort law would recognize a legal duty of care for which damages may be awarded is a wholly separate question from (1) whether the officers were bound by the order and could be held to answer in contempt for any violation, and (2) whether the terms of the order create a non-discretionary entitlement. That one state court has recognized a private right of action based upon similar statutory terms, Nearing v. Weaver, 670 P.2d 137, 140-41 (Ore. 1983), does not persuade me that Colorado would do so, particularly given the seemingly mandatory language contained in so many Colorado enactments and the expansion of liability that such a change portends.

DeShaney foreshadowed an argument that state statutes (and perhaps orders incorporating those statutes) might create an entitlement to receive protective services. DeShaney, 489 U.S. at 195 n.2. Sandin suggests limits on recognizing a liberty interest based upon mandatory language and substantive conditions contained in a state statute or regulation. The Court indicated that such an approach "may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public," but concluded that it is "less sensible in the case of a prison regulation primarily designed to guide correctional officials in the administration of a prison." Sandin, 515 U.S. at 481-82. This court concludes that the approach has not been foreclosed "in non-prison settings," Ct. Op. at 18 n.6, and applies it here, but a more nuanced approach

ought to be considered.  After all, the Court abandoned this approach because it focused more on the statutory language rather than the nature of the alleged deprivation and "in practice [was] difficult to administer and . . . produce[d] anomalous results."  Sandin, 515 U.S. at 481, 483 n.5.  This is apparent when one considers the apparently mandatory duties of the police chief who "shall apprehend any person in the act of committing any offense against the laws of the state or ordinances of the city and, forthwith and without any warrant, bring such person before a municipal judge, county judge, or other competent authority for examination and trial pursuant to law."  Colo. Rev. Stat. § 31-4-112 (2003).  Although couched in mandatory terms, it does not create a property interest in enforcement of the criminal law any more than the specific criminal statute in this case or the order which incorporates the terms of the statute.

In concluding that the order creates mandatory duties, the court relies upon language (contained in the statute and the notice provisions of the order) that law enforcement "shall use every reasonable means" and "shall arrest" on probable cause.  Ct. Op. at 20-21; Colo. Rev. Stat. § 18-6-803.5(3)(a)–(b); see also Gonzales, 307 F.3d at 1265 ("shall" means "shall" and creates a mandatory obligation).  Amici Colorado Municipal League, Colorado Counties, Inc., and the Colorado Association of the Chiefs of Police note that the term "shall" is used throughout the statute to describe the procedural requirements attendant to arrest

-15-

and prosecution, and that each of these acts of criminal procedure could subject

local governments and individual peace officers to liability for civil damages and

attorney's fees under 42 U.S.C. §§ 1983 and 1988.[4]  Amici correctly focus this

court's attention on the numerous <u>procedural</u> requirements in this statute,

prompting the question of whether the procedural requirements in the peace

officer provision should be construed differently than the provisions attendant to

subsequent prosecution.

---

[4]  Amici Br. at 10-11 (<u>see</u> Colo. Rev. Stat. § 18-6-803.5(3)(d) (2003) ("The arrested person *shall* be removed from the scene of the arrest and *shall* be taken to the peace officer's station for booking . . . .  The prosecuting attorney *shall* present any available arrest affidavits and the criminal history of the restrained person to the court at the time of the first appearance of the restrained person before the court.") (emphasis added); <u>id.</u> § 18-6-803.5(3)(e) ("The arresting agency arresting the restrained person *shall* forward to the issuing court a copy of such agency's report, a list of witnesses to the violation, and, if applicable, a list of any charges filed or requested against the restrained person.   The agency *shall* give a copy of the agency's report, witness list, and charging list to the protected party.  The agency *shall* delete the address and telephone number of a witness from the list sent to the court upon request of such witness, and such address and telephone number shall not thereafter be made available to any person, except law enforcement officials and the prosecuting agency, without order of the court.") (emphasis added); <u>id.</u> § 18-6-803.5(4) ("If a restrained person is on bond in connection with a violation or attempted violation of a protection order in this or any other state and is subsequently arrested for violating or attempting to violate a protection order, the arresting agency *shall* notify the prosecuting attorney who *shall* file a motion with the court which issued the prior bond for the revocation of the bond and for the issuance of a warrant for the arrest of the restrained person if such court is satisfied that probable cause exists to believe that a violation of the protection order issued by the court has occurred.") (emphasis added)).

Notwithstanding the legislative history relied upon by this court, the language of Colo. Rev. Stat. § 18-6-803.5(3) simply does not require peace officer arrests in every case any more than it requires prosecutors to prosecute every case. App. 122; see also Colo. Rev. Stat. 18-6-803.5(3)(d) ("The arrest and detention of a restrained person is governed by applicable constitutional and applicable state rules of criminal procedure."). By the same reasoning, the recitation of the statute in the protective order's notice provisions does not automatically require a peace officer arrest in this specific case. While the statute channels a peace officer's discretion by establishing factors that inform the probable cause determination for an arrest, peace officer discretion is not eliminated. Any other conclusion necessarily means that enforcement of this misdemeanor offense or this particular protective order prevails over any other law enforcement priorities and regardless of the circumstances. Those circumstances (not addressed by the statute or the protective order) might include the apparent seriousness of the alleged violation, the likely response of the restrained person, i.e. flight, violence or acquiescence, and the existence of any cooperating witnesses or protected persons. Such could not have been the intent of the Colorado legislature, let alone the judge that issued this protective order. See Sealed v. Sealed, 332 F.3d 51, 57-59 (2nd Cir. 2003) (finding statute that contained mandatory language authorizing removal of child ambiguous insofar as

creating a substantive entitlement and certifying the interpretive issue to state supreme court). Just as in Sandin, the purpose of the section of the statute relied upon by this court is to guide law enforcement in the administration of a criminal offense. To be sure, the statute evinces serious concerns about protected persons, but not to the exclusion of protecting the public, other law enforcement priorities, and peace officers themselves.

Finally, the court decides what process is due here. An officer must determine whether a valid order exists, and whether there is probable cause to believe that the restrained person has notice of the order and is violating it. Ct. Op. at 46. If the officer will not enforce the order, "the person claiming the right should be notified of the officer's decision and the reason for it." Id. Because I would not find a property interest, it is unnecessary to comment on the utter impracticality of requiring law enforcement officers to conduct pre-deprivation hearings in the course of their other duties. See Archie v. City of Racine, 847 F.2d 1211, 1217 (7th Cir. 1988) (en banc) ("It is hardly possible to hold hearings in advance to decide whether fire dispatchers will turn deaf ears to cries of distress.").

No. 01-1053, *Gonzales v. City of Castle Rock*

**McCONNELL**, J., joined by **TACHA**, C.J., and **KELLY** and **O'BRIEN**, JJ., concurring in part and dissenting in part.

Jessica Gonzales's complaint sets forth claims under the Due Process Clause of the Fourteenth Amendment without distinguishing between the procedural and substantive components of that provision. The district court analyzed the complaint separately under both procedural and substantive due process standards, and dismissed the complaint in both respects. The majority affirms dismissal of the substantive due process claim, but reverses as to the procedural claim. The majority devotes the bulk of its opinion to determining "whether a court-issued domestic restraining order, whose enforcement is mandated by a state statute, creates a property interest protected by the due process clause of the Fourteenth Amendment." Maj. Op. 2. I dissent on the ground that, even assuming the restraining order coupled with the statute creates a property interest protected by the Due Process Clause, Ms. Gonzales's complaint raises only a substantive and not a procedural claim.[1]

The facts, as alleged in the complaint, are that Ms. Gonzales repeatedly contacted the police regarding an apparent violation of a domestic relations restraining order, but the officers did nothing, as a result of which her children were murdered by their father. The Supreme Court has held that the Due Process

---

[1] I dissent only with respect to the majority's reversal of the district court's dismissal of Ms. Gonzales's procedural due process claim. In all other respects, I concur.

Clause, of its own force, does not create a liberty or property interest in protection by the police. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). The majority correctly points out, however, that *DeShaney* is arguably distinguishable in this case, because the plaintiff does not rely on the Due Process Clause itself as the foundation for her claim of constitutional entitlement, but on a source in state law. Maj. Op. 11-12. The majority never convincingly explains, however, why her claim is procedural rather than substantive.

When a plaintiff asserts that a protected liberty or property interest has been infringed by action of the executive branch (such as police officers), the Supreme Court holds that the primary test for whether the action violates substantive due process is whether it "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).[2] Only when a plaintiff asserts that government action is procedurally unfair – usually for lack of a hearing – does the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 333-35 (1976), invoked by the majority (Maj. Op. 43-44), apply. *Mathews* is a far different, and less restrictive, test for a plaintiff to satisfy than the "shocks the conscience" test.

---

[2]There is no need to reflect here on whether the egregious dereliction of the Castle Rock police department (assuming the allegations of the complaint to be true) meets this high standard, because Ms. Gonzales's substantive due process claim was dismissed, that dismissal was affirmed by the panel, and en banc review of that portion of the panel's decision was not sought. *See* Maj. Op. 11 n.3.

The question is whether the facts, as alleged, constitute a procedural due process claim. I think they do not. The "touchstone of due process" – both substantive and procedural – "is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), quoted in *Lewis*, 523 U.S. at 845. But a procedural due process claim is based on "a denial of fundamental procedural fairness," while a substantive claim is based on the "exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 845-46.

Although the majority employs the language of procedural due process, Ms. Gonzales's complaint contains no reference to procedural issues in any form. She does not complain that she was denied a "right to be heard," *Mathews*, 424 U.S. at 333, or that the police conduct was "procedurally unfair," Maj. Op. 33 n.13. She makes no allegations regarding "*the manner* by which the police allegedly deprived [her] of her interest in enforcement of the restraining order." Maj. Op. 36 n.15 (emphasis in original). She does not allege that if she had been given the opportunity of presenting her views to the decisionmakers, it would have affected the outcome. The language of procedural unfairness comes from the majority opinion, not from the complaint. Ms. Gonzales's complaint is that the police officers arbitrarily and for no legitimate reason failed to enforce the protective order. *See* Complaint, ¶¶ 21, 28 (The Defendants' "actions were taken either

-3-

willfully, recklessly or with such gross negligence as to indicate wanton disregard and deliberate indifference to the civil rights of Plaintiff and the three children."). That is a quintessentially substantive claim; it goes to the lack of justification for the police officers' failure to act and not to the process by which they reached their decision.

As a matter of constitutional categorization, Ms. Gonzales's claim is not distinguishable from that in *Lewis*. There, the plaintiffs sued police officers for depriving their son of his life (undoubtedly a protected interest under the Due Process Clause) as a result of a high-speed police chase alleged to be deliberately indifferent to, or in reckless disregard for, his safety. *See* 523 U.S. at 854 (plaintiffs alleged that the police action manifested "recklessness, gross negligence and conscious disregard for [plaintiff's] safety"; "deliberate indifference"). Here, using the same vocabulary of recklessness, gross negligence, and deliberate indifference (Complaint, ¶¶ 21, 28), Ms. Gonzales sues for an allegedly arbitrary and unjustified failure to enforce a protective order. The only difference is that *Lewis* involved action, while this case involves a failure to act. In both cases, however, the crux of the matter is that allegedly arbitrary and unjustifiable police conduct resulted in a deprivation. Nor could the problem be solved by the addition of procedural language to Ms. Gonzales's complaint. The plaintiffs in *Lewis* could not have prevailed simply by

-4-

recharacterizing their complaint as one of procedural due process, by saying, for example, that the police should have engaged in some form of pre-deprivation procedure to decide whether they should engage in the high-speed chase.[3] The distinction between procedural and substantive due process is not one of pleading, but of the nature of the claim.

The majority's argument to the contrary is long on assertion and short on explanation. *See* Maj. Op. 33 n.13, 36 n.15. The majority claims:

> However, contrary to Judge McConnell's contentions, Ms. Gonzales is not alleging that the officers' denial of her enforcement rights arose out of unjustified governmental action. Rather, her claim is that it was procedurally unfair for the police arbitrarily to decline to perform duties required of them pursuant to a mandatory court order which provided her a substantive property right under state law, and pursuant to a state statute commanding the same.

Maj. Op. 33 n.13. But quite the opposite is true. The problem, as alleged by Ms. Gonzales, is that the police officers *for no sufficient reason* ("recklessly" or with "gross negligence") failed to enforce the restraining order. Her claim is precisely that the officers' conduct was *unjustified*. *Cf. Lewis*, 523 U.S. at 845 (a claim that government action is "without any reasonable justification" is a substantive due process claim). If, on remand, it turns out that the police officers did not

_____

[3]Although the Court left open the possibility of a procedural due process claim in cases like *Lewis*, it suggested that the only available procedural claim in such cases is a post-deprivation compensation scheme. 523 U.S. at 840 n.4. The majority's view, by contrast, is that Ms. Gonzales was entitled to some kind of pre-deprivation procedure.

behave "arbitrarily" but had a good reason for their actions (for example, every available officer was away tending to a dreadful emergency), Ms. Gonzales would lose on the merits. By contrast, in all the procedural due process cases on which the majority relies, the focus of the litigation was on the process by which the state actor reached the decision – not on whether the ultimate result was justified. See *Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("the right to procedural due process . . . does not depend upon the merits of a claimant's substantive assertions"). In a procedural due process case, a claimant who is denied a hearing to which he is entitled will prevail, even if the state action was substantively justified. *Id.* In the present case, by contrast, unless Ms. Gonzales can substantiate her allegations that the police officers acted "arbitrarily" – that is, without adequate justification under the law – she will lose.

The substantive character of Ms. Gonzales's claim is further evident in the fact that she does not propose any *procedures* that should be instituted when persons protected by restraining orders request police action. She cannot say she was not given a chance to be heard. She called several times and explained the situation to the police, and she met with the police in person both at her home and at the police station. The problem is not that she was denied a hearing, but that the officers failed to do their duty. The problem was with the result.[4] This is in

_____

[4]My point is not – as the majority suggests (Maj. Op. 44) – that Ms.

(continued...)

-6-

marked contrast to the Supreme Court's procedural due process cases, on which the majority relies (Maj. Op. 15-16): *Board of Regents v. Roth*, 408 U.S. 564 (1972); *Perry v. Sindermann*, 408 U.S. 593 (1972); *Goss v. Lopez*, 419 U.S. 565 (1975); *Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969); *Barry v. Barchie*, 443 U.S. 55 (1979); *Bell v. Burson*, 402 U.S. 535 (1971); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978); *Goldberg v. Kelly*, 397 U.S. 254 (1970); and *Mathews v. Eldridge*, 424 U.S. 319 (1976). In each of these cases, the consequence of finding a procedural due process violation would be to require the government to provide some type of hearing, either in advance of the deprivation or within a reasonable time thereafter. *See* Henry J. Friendly, *"Some Kind of Hearing"*, 123 *U. Pa. L. Rev.* 1267 (1975). The litigation did not hinge, as here, on whether the results were justified, but on whether the plaintiffs had the opportunity to be heard by the appropriate officials.

The majority is remarkably vague about what kind of "hearing" Ms. Gonzales should have received. *See* Maj. Op. 42-43 ("we note that 'due process is flexible and calls for such procedural protections as the particular situation demands'") (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The

----

[4](...continued)
Gonzales's claim fails because she *received* the hearing to which she was supposedly entitled. It is that the presence, or lack, of a hearing is not the real issue.

-7-

majority suggests that "the restraining order enforcement statute provides direction in answering the question of what additional procedural safeguards could have been employed by the police officers." Maj. Op. 45. According to the majority, these "safeguards" consist of (1) determining whether a valid order exists, (2) determining whether probable cause exists that the restrained party has notice of the order and is violating it, and (3) notification of the officer's decision and the reason for it. *Id*. at 46. The first two are plainly irrelevant: neither the existence of the order nor the existence of probable cause has ever been disputed. That leaves the third: informing Ms. Gonzales of the officers' "decision." It seems to me that, if the police had told Ms. Gonzales they were not going to take action, Ms. Gonzales would have precisely the same constitutional claim she does now– only somewhat easier to prove. Surely the majority does not mean to suggest that the "procedural safeguard" Ms. Gonzales was entitled to was being informed that she would get no help.[5]

These suggestions thus confirm the non-procedural character of Ms. Gonzales's claim. Unlike the plaintiffs in *Perry*, *Goss*, *Sniadach*, *Barry*, *Bell*, *Logan*, *Memphis Light*, *Goldberg*, and *Mathews*, Ms. Gonzales's deprivation was not the result of an erroneous determination on a question of fact. It was, as

---

[5]If that were an adequate procedural safeguard, Memphis Light satisfied its procedural due process obligation when it informed the Crafts their utilities would be cut off, *Memphis Light*, 436 U.S. at 13-14, and Mr. Kelly got what was "due" when he was told his welfare was terminated, *Goldberg*, 397 U.S. at 267-68.

alleged, "arbitrary" in the sense of having no justification at all. It was an act of "deliberate indifference," like that in *Lewis*, 523 U.S. at 850-51, a *substantive* due process case.

At oral argument, Ms. Gonzales's counsel suggested that the procedures to which she was entitled were those set forth in the applicable Colorado statute: to use every reasonable means to enforce the order, including arresting the offender or, if actual arrest is not feasible, seeking an arrest warrant. But these procedures constitute Ms. Gonzales's substantive entitlement; they are what she claims she was deprived of without due process. These are not procedures to determine whether she was entitled to enforcement of the order, which is what procedural due process is about.

If the majority is correct, it will always be possible for plaintiffs to recharacterize their substantive due process claims against arbitrary action by executive officials as "procedural due process" claims, thus avoiding the Supreme Court's exacting "shocks the conscience" test and getting, instead, the balancing test of *Mathews*. It will always be possible to say that, before they took the complained-of action, the executive officials should have engaged in some additional deliberative process, which might have averted the problem. For example, in *Abeyta by and through Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1257-58 (10th Cir. 1996), we held that a school teacher

who repeatedly called a 12-year-old student a "prostitute" did not violate her substantive due process rights because his conduct, while reprehensible, was not sufficiently egregious to "shock the conscience." Under the majority's reasoning, the plaintiff should have styled the claim as a procedural deprivation (of her liberty interest in personal security and emotional well-being) and alleged that the real harm was that the teacher determined that she was a prostitute without first holding a hearing on the question. Similarly, in *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir. 1995), this Court rejected a substantive due process claim by a therapist at a mental hospital who was killed by an inmate as the result of a decision by hospital administrators to close a special unit for the criminally insane, because the decision "was not the result of reckless and 'conscience shocking' conduct." *Id.* at 576. Again, however, today's opinion would allow the plaintiff to get around *Lewis* by alleging a procedural defect, for example, that the hospital administrators ought to have engaged in a more thorough consideration of the dangers of closing the special unit.

In *Reno v. Flores*, 507 U.S. 292 (1993), the Supreme Court gave short shrift to a plaintiff's attempt to reformulate an essentially substantive due process claim in procedural terms. In that case, the Supreme Court rejected the plaintiff's substantive due process claim that a child had a fundamental right to be free from custody when freedom from custody might be in the child's best interest. *Id.* at

305-06. The plaintiff also characterized the argument as a procedural due process claim by arguing that the government's procedures failed to make a case-by-case determination of the best interest of the child when it decided whether to keep a child in custody. The Supreme Court rejected the attempt to disguise a substantive claim as a procedural one: "Respondents contend that this procedural system is unconstitutional because it does not require the [INS] to determine in the case of each individual alien juvenile that detention in INS custody would better serve his interests than release to some other 'responsible adult.' This is just the 'substantive due process' argument recast in 'procedural due process' terms, and we reject it for the same reasons." *Id*. at 308.

The effect of allowing claims that are essentially substantive to masquerade as procedural is to collapse the distinction between the two components of due process and to expand greatly the liability of state and local governments. Sympathetic though we are, and should be, to persons in Ms. Gonzales's unhappy situation, we are not authorized under the Fourteenth Amendment to do what she asks.

<u>*Gonzales v. City of Castle Rock et. al.*</u>, No. 01-1053

**O'BRIEN**, Circuit Judge, dissenting, with whom **TACHA**, Chief Circuit Judge, and **KELLY**, Circuit Judge, join:

The majority opinion ignores guiding principles announced in *DeShaney*,[1] leaving us both adventurous and alone,[2] dramatically separated from other circuits.[3]  This decision rests on tenuous grounds and invites litigation in even

---

[1] *DeShaney v. Winnebago*, 489 U.S. 189 (1989).

[2] In nearly fifteen years since *DeShaney* no other circuit has ventured this far.  However, in a similar case the Second Circuit, citing the panel decision, certified a question about the reach of a child welfare statute to the Connecticut Supreme Court.  *Sealed v. Sealed*, 332 F.3d 51 (2d Cir. 2003).

[3] All circuits reaching the merits have gone the other way.  *Jones v. Union County, Tenn.*, 296 F.3d 417, 429 (6th Cir. 2002) (holding, among other things, that a state actor's violation of a Tennessee statute providing, "[t]he court **shall** cause a copy of the [family violence] petition . . . to be served upon the respondent at least five (5) days prior to such hearing" did not qualify as a state created liberty or property interest under *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) (emphasis added)); *cf.*, *Matthews v. Pickett County, Tenn.*, 996 S.W. 2d 162 (Tenn. 1999) (allowing a state tort action against police officers who negligently failed to arrest a restrained person when requested by the victim); *Doe by Fein v. District of Columbia*, 93 F.3d 861 (D.C. Cir. 1996) (rejecting a procedural due process claim for failing to effectuate child abuse protective services, finding there is no entitlement to such protective services under mandatory child abuse statute); *Harrill v. Blount County, Tenn.*, 55 F.3d 1123, 1125 (6th Cir. 1995) (a Tennessee statute requiring an arrestee to be given an opportunity to make a phone call before "booking" did not create a protected property or liberty interest); *Doe v. Milwaukee County*, 903 F.2d 499 (7th Cir. 1990) (rejecting a procedural due process claim for failing to investigate child abuse, finding no "entitlement" in such procedures—no entitlement triggering due process protection in statutorily required child abuse investigation).  *See also Archie v. Racine*, 847 F.2d 1211 (7th Cir. 1988) (no property interest in required fire protection—prior to *DeShaney*), *cert. denied,* 489 U.S. 1065 (1989); *Pierce v. Delta County Dep't of Social Svcs.*, 119 F.Supp.2d 1139 (D. Colo. 2000) (rejecting a procedural due process claim for failing to comply with statutory

more dubious cases.  For those reasons, I dissent and join the dissents of Judge Kelly and Judge McConnell.

Superficially bowing to Supreme Court precedent, the majority acknowledges the futility of the substantive due process arguments.  But the veneer of procedural due process applied in its stead hardly obscures the obvious–the method is an artifact of substantive due process; perverse, because, surreptitiously, it achieves the very result *DeShaney* decried.  No matter how fervently we desire mankind to be honest, life to be fair, and the laws to be obeyed, our hopes are not entitlements for which individuals may exact a monetary remedy from state entities and actors when reality does not meet expectations.

And in reality's penetrating light there can be no doubt; Ms. Gonzales is not seeking a remedy for a pretermitted hearing.  Irrespective of Colorado tort law, she wants the equivalent of a tort remedy against the City of Castle Rock for the deaths of her three daughters, deaths delivered at their father's hand.  Her

---

child protection reporting and investigatory procedures, finding there is no entitlement to protective services under these procedures); *Semple v. City of Moundsville*, 963 F. Supp 1416 (N.D. W. Va. 1997) (rejecting a procedural due process claim for failing to advise domestic abuse victims of their rights and failing to serve domestic violence temporary protective order as required by statute, finding no entitlement to such procedures), *cert. denied,* 528 U.S. 1189 (2000).

claimed entitlement (enforcement of a restraining order) is not a property interest

and, accordingly, does not warrant due process protection.

**Principle —**

In *DeShaney* social workers removed a child from his father's care,

suspecting abuse, but later returned the child to him.  After the child was

returned, the father repeated his abuse, rendering the child permanently brain

damaged.  The issue was whether state actors were liable for damages on

substantive due process grounds.  That decision should provide the analytical

touchstone for this case:

> [N]othing in the language of the Due Process Clause itself requires
> the State to protect the life, liberty, and property of its citizens
> against invasion by private actors.  The Clause is phrased as a
> limitation on the State's power to act, not as a guarantee of certain
> minimal levels of safety and security.  It forbids the State itself to
> deprive individuals of life, liberty, or property without "due process
> of law," but its language cannot fairly be extended to impose an
> affirmative obligation on the State to ensure that those interests do
> not come to harm through other means . . . .  Its purpose was to
> protect the people from the State, not to ensure that the State
> protected them from each other.

489 U.S. at 195-96.  The Court emphasized the need for rational analysis in

emotionally laden cases:

> Judges and lawyers, like other humans, are moved by natural
> sympathy in a case like this to find a way for Joshua and his mother
> to receive adequate compensation for the grievous harm inflicted
> upon them.  But before yielding to that impulse, it is well to
> remember once again that the harm was inflicted not by the State of
> Wisconsin, but by Joshua's father.  The most that can be said of the

state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them. In defense of them it must also be said that had they moved too soon to take custody of the son away from the father, they would likely have been met with charges of improperly intruding into the parent-child relationship, charges based on the same Due Process Clause that forms the basis for the present charge of failure to provide adequate protection.

*Id.* at 202-03.

With unmistakable clarity, the Court said "the State had no constitutional duty to protect Joshua against his father's violence, its failure to do so–though calamitous in hindsight–simply does not constitute a violation of the Due Process Clause." *Id*. at 202. Seemingly, but apparently not, *DeShaney* put to rest the notion that simply because a state takes steps to protect citizens from harm it thereby insures them against all ravages of modern life.

The majority of this Court observes that *DeShaney* resolved a "substantive due process" issue and did not reach the companion "procedural due process" arguments. *Id*. at n.2. That observation, while correct, provides cold comfort. The Supreme Court acknowledged the right of a state to expand its tort law to include "special relationship" tort liability, but the decision can hardly be considered to contain an invitation to expand the entitlement rationale of procedural due process. *Id*. at 203. Particularly so in light of the caveat, frequently repeated, that the Due Process Clause does not "transform every tort committed by a state actor into a constitutional violation." *Id*. at 202. The

-4-

majority ignores that admonition and its companion; states should not have liability "thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment."[4] *Id.* at 203. I see no reason to ignore the principles clearly and forcefully stated in *DeShaney* and *Collins*.

For me, this case reduces to utter simplicity. Should directive language from a Colorado statute be expansively construed for the sole purpose of subjecting state entities and actors to thinly disguised federal tort liability? I think not. We should defer to the State of Colorado, allowing it to determine the

---

[4] Apparently it bears repeating. Shortly after *DeShaney*, in *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992), the Supreme Court reiterated the principle, but in a slightly different context, saying:

> Petitioner's claim is analogous to a fairly typical state-law tort claim: The city breached its duty of care to her husband by failing to provide a safe work environment. Because the Due Process Clause "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society," *Daniels v. Williams,* 474 U.S., at 332, 106 S.Ct., at 665, we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law, see, *e.g., id.,* at 332-333, 106 S.Ct., at 665-666; *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979); *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). The reasoning in those cases applies with special force to claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship. See, *e.g., Bishop v. Wood,* 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976); *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577-578, 92 S.Ct. 2701, 2709-2710, 33 L.Ed.2d 548 (1972).

reach of its laws consistent with its constitution, statutes, cases and traditions.  If

*DeShaney* and *Collins* did not pave the way, they certainly lit the path.  In any

event, principle aside, "entitlement" analysis cannot justify the majority's result.

**Property —**

The majority is "persuaded Ms. Gonzales' complaint states a claim that she

possessed a protected property interest in the enforcement of the terms of her

restraining order and that the officers' arbitrary denial of that entitlement violated

her procedural due process rights."  Majority Op., p. 14.  It says that is so because

"where a court order commands the grant of a government benefit or service

through the use of mandatory language and objective predicates limiting the

discretion of official decision makers, a protected property interest exists."  *Id.*,

pp. 17-18.[5]  It emphasizes "that Ms. Gonzales' entitlement to police

---

[5] The majority tells us, "[o]ur conclusion that the domestic abuse restraining order, whose enforcement is mandated by statute, creates a constitutionally protected entitlement, is supported by case law from other jurisdictions."  Majority Op., p. 30.  Indeed, two district court opinions did so hold.  *Siddle v. City of Cambridge, Ohio,* 761 F.Supp. 503 (S.D. Ohio 1991); *Coffman v. Wilson Police Dep't*, 739 F. Supp. 257 (E.D. Pa. 1990).  But *Flynn v. Kornwolf*, 83 F.3d 924 (7th Cir. 1996), is quite another matter.  In that case, plaintiffs claimed the court order appointing them to the position of court attendants bestowed a property right in spite of contrary Wisconsin law.  The district court and the Seventh Circuit concluded otherwise.  The court's use of the "explicitly mandatory language" in evaluating an administrative order dealing with court personnel is hardly analogous to this situation, but the result is enlightening because the court refused to use the court order to extend liability. It said:

> Next, the plaintiffs contend that the March 1993 court order
> appointing them court attendants gave them a property interest in

-6-

enforcement of the restraining order against Mr. Gonzales arose when the state

---

their employment.  The order lists the plaintiffs' names, defines their authority, and states that the order expires on December 31, 1993.  The plaintiffs argue that the order appointed them for a definite term, and therefore they had a "legally enforceable expectancy" in their employment and could be terminated only for cause.

The Wisconsin Supreme Court has held that "[a]bsent civil service regulations or laws, or a contract or collective bargaining agreement, a [public] employee is an employee at will and has no property interest in employment." *Vorwald v. School Dist. of River Falls,* 167 Wis. 2d 549, 557, 482 N.W.2d 93, 96, *cert. denied*, 506 U.S. 941, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992).  The plaintiffs contend that, like civil service regulations or laws, or contracts or collective bargaining agreements, the court order appointing them abrogated Wisconsin's general rule of at-will employment and made their employment terminable only for cause.  They assert that the order gave them a "legitimate claim of entitlement" to their employment during its effective dates, and that they therefore had a property interest in their jobs.

The plaintiffs' argument fails.  Although the court order appointing them to their positions did contain an expiration date, it "place[d] no substantive restriction on the county's [or the appointing judges'] authority to terminate" the plaintiffs before it expired.  *See Warzon,* 60 F.3d at 1240.  Nowhere does the order state in "explicitly mandatory language" that the appointing judges have limited discretion to terminate the plaintiffs' employment at the judges' will.  *See Fittshur,* 31 F.3d at 1406.  Absent such language, the mere fact that the plaintiffs allegedly relied on the order as guaranteeing their employment until the order expired was not sufficient to create a property interest that would trigger due process protections.

Because neither Racine County Ordinance § 17-1 *et seq.* nor the court order gave the plaintiffs a property interest in their employment, the defendants were free to terminate them "whenever and for whatever reasons [they] so desire [d]." *Wilcox v. Niagara of Wisconsin Paper Corp.,* 965 F.2d 355, 358 (7th Cir. 1992).  The district court properly dismissed the plaintiffs' complaint for failure to state a claim.

*Id.* at 926-27.

-7-

court judge issued the order, which defined Ms. Gonzales' rights." *Id.*, p. 14. If the court order is of such significance, that significance must be measured by its terms, recognizing that in an adversarial system courts do not create rights but adjudicate and declare the rights of the litigants under existing law.

The "TEMPORARY RESTRAINING ORDER PURSUANT TO SECTION 14-10-108, C.R.S." (TRO) is directed only to the Respondent, Simon James Gonzales. Nothing in the decretal portion of the TRO (or any other portion of the TRO itself) is directed to any individual or entity of the law enforcement community. A copy of the TRO is attached. <u>Below</u> the date and judge's signature appears a caveat: "PLEASE NOTE: IMPORTANT NOTICES FOR RESTRAINED PARTIES AND LAW ENFORCEMENT OFFICIALS ON REVERSE." The "Notice To Law Enforcement Officials" contained on the reverse paraphrases the Colorado Statutes. The permanent order, entered in the divorce (a separate case) and stipulated to by the parties, extended and slightly modified the family violence TRO. It allowed Mr. Gonzales parenting time, but contained no more explicit terms about enforcement. No law enforcement entities or individuals were parties to the family violence case or the companion divorce case. The order did, indeed, "define Ms. Gonzales' rights," but whatever substantive rights were declared or established by the court could only be in relation to her husband, the only other party to the litigation. Those are the

substantive rights due process must serve. The attendant process for enforcement of such rights is well known to courts and litigants alike—resort to the court for orders in aid of execution or to exercise its contempt powers; remedies that have their own procedural due process requirements. Any process to which Ms. Gonzales was due based upon the decretal, and therefore enforceable, language of the TRO (and centuries of jurisprudence) has nothing to do with law enforcement officers. It is the right to an appropriate remedy against a contumacious party, judicially imposed after a hearing. That process was never denied Ms. Gonzales.

If Ms. Gonzales has additional rights, which amount to property entitled to due process protection, they must derive from a legitimate source, such as the common law or, as she claims, the Colorado statutes. Ms. Gonzales must demonstrate that her claimed statutory rights are specific, certain and enforceable.[6] "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite." *Roth*, 408 U.S. at 569-70 (footnote omitted).

Even if "property interests protected by procedural due process extend well

---

[6]*Doyle v. Oklahoma Bar Ass'n*, 998 F.2d 1559, 1569 (10th Cir. 1993). *See discussion infra*, n.7.

-9-

beyond actual ownership of real estate, chattels, or money" and may take many forms, the most generous definition is constitutionally confined. *Id*. at 571-72 (footnote omitted). "[W]hile the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." *Id*. at 572. Thus the Court expressly acknowledged the constitutional mooring of, and limits upon, procedural due process jurisprudence.[7] In doing so, it emphasized that procedural due process applies to property interests "that a person has already acquired in specific benefits." *Id*. at 576. To obtain a property interest in a "benefit," a person clearly must have more than an abstract need, desire or unilateral expectation of it. *Id*. at 577. Rather, they must have a legitimate claim of entitlement to it. *Id*.

As important as *Roth's* recognition that the procedural protection language of the Constitution is limiting as well as defining, is its holding that such property interests are not derived from the United States Constitution. "Rather they are

_____

[7]*Roth*'s holding that the Fourteenth Amendment's procedural protection applies only to <u>life, liberty and property</u> interests may have been a retreat from a prior and more expansive reading, which extended procedural protection to "important interests," *Bell v. Burson*, 402 U.S. 539 (1971) and "grievous loss," *Goldberg v. Kelly*, 397 U.S. 254, 263 (1970) (Burger, J. and Black, J., dissenting) (quoting *Joint AntiFascist Refugeee Comm. v. McGrath*, 341 U.S. 123, 168 (1951)). Clearly the line defining property lies somewhere south of interests simply determined, by judicial fiat, to be worthy.

created and their dimensions are defined by existing rules or understanding that stem from an independent source such as state law–rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id*. Lest that tenet be perceived as no more than federal condescension, hollow and brittle, serious consideration of state law must inform any decision that concludes a "property interest" has been "created or defined" by state statute.[8] And the "property interest must be specific and presently enforceable." *Doyle*, 998 F.2d at 1569.

Colo. Rev. Stat. § 18-6-803.5(3) (2002), upon which Ms. Gonzales relies, provides (in part):

(3)(a) Whenever a protection order is issued, the protected person

---

[8]In *Nichols v. City of Kirksville*, 68 F.3d 245 (8th Cir. 1995), Nichols claimed that a collective bargaining agreement with the city, which permitted discharge only for cause and established a hearing process, created a protected property right under *Roth*. The Court, looking to Missouri's statutory and case law, decided that Nichols was an at-will employee in spite of the contrary terms of the collective bargaining agreement. The rights secured by the collective bargaining agreement were not enforceable under state law and could not, therefore, be property. *Id.* at 248-49; *see also Flynn*, 83 F.3d 924 (court's administrative order did not give employers property rights in their employment in the face of the state's "at will" statute). In short, without an enforceable remedy there is no property right and it is the obligation of the person claiming the right to establish that it qualifies as property. "No procedural due process claim can exist until a sufficiently certain property right under state law is first shown." *Greenbriar Village, L.L.C. v. City of Mountain Brook*, 345 F.3d 1258 (11th Cir.), *reh'g denied*, 83 Fed. Appx. 393 (2003). "There is no reason, however, to restrict the 'uncertainty' that will preclude existence of a federally protectable property interest to the uncertainty that inheres in an exercise of discretion. Uncertainty as to the meaning of applicable law also suffices." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) (footnote omitted).

shall be provided a copy of such order. A peace officer shall use every reasonable means to enforce a protection order.

(b) A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person when the peace officer has information amounting to probable cause that:

(I) The restrained person has violated or attempted to violate any provision of the protection order; and

(II) The restrained person has been properly served with a copy of the protection order or the restrained person has received actual notice of the existence and substance of such order.

(c) In making the probable cause determination described in paragraph (b) of this subsection (3), a peace officer shall assume that the information received from the registry is accurate. A peace officer shall enforce a valid protection order whether or not there is a record of the protection order in the registry.[9]

It is a shallow exercise to look at a statute in isolation, apply a simplistic

syllogism, conclude the statute confers an entitlement, denominate it property and

---

[9] The statute merely establishes a process–enforcement by every *reasonable* means, and to arrest upon information *amounting to probable cause* that the restraining order has been violated. Both "reasonable means" and "probable cause" are phrases distinctly familiar for their evaluative component, the discretionary element they imply and the deference given to decision makers in the field. If the restraining order had restricted the husband from calling the home and he called one time and immediately hung up, would the police be required to arrest and book him even if they determined he had mistakenly pushed the wrong automatic dialing button and promptly hung up upon discovering his error? If the restraining order established a 100-yard separation distance and investigating officers determined that he inadvertently came within 299 feet and there were no aggravating facts, would an arrest be nevertheless required? If the answer can reasonably be "no" the discretionary element is manifest and the debate becomes one of degree, not of kind. The fact that these officers did nothing is no more significant than if they had acted, but too slowly or ineptly–both courses might be negligence; neither is actionable as a "procedural due process" violation.

thereby trigger the panoply of due process protections.[10] That method not only fails to meet *Roth's* promise that federal courts will look to state law as the fountainhead of constitutionally protected property interests, but invites unintended consequences.[11] For instance, the syllogistic approach would logically and equally be applicable to Colo. Rev. Stat. § 31-4-112, which provides:

> The marshal or chief of police, or any member of the police force **shall suppress** all riots, disturbances, and breaches of the peace, **shall apprehend** all disorderly persons in the city, and **shall pursue and arrest** any person fleeing from justice in any part of the state. He **shall apprehend** any person in the act of committing any offense against the laws of the state or ordinances of the city and, **forthwith and without any warrant**, bring such person before a municipal judge, county judge, or other competent authority for examination and

---

[10] This is the lesson of *Sandin v. Conner*, 515 U.S. 472, 482-84 (1995) (Ginsberg, J., dissenting).

[11] This case imposes liability in a manner the state legislature could not have intended (discussed *infra*). And the mischief is now ready for export. The Colorado statutes contain remarkable language: "[a] protection order issued in the state of Colorado shall contain a statement that: (a) The order or injunction **shall** be accorded full faith and credit and **be enforced** in every civil or criminal court of the United States, another state, an Indian tribe, or a United States territory pursuant to 18 U.S.C. sec. 2265." Colo. Rev. Stat. § 18-6-803.5(8) (emphasis added). The language echos that of the Model Code on Domestic and Family Violence, drafted by the Advisory Committee and approved by the National Council of Juvenile and Family Court Judges Board of Trustees in 1994.

If the TRO (with its reference to the Colorado statutes–a fact the majority considers significant) is entitled to full faith and credit along with the judicial baggage it now carries, the extraterritorial effect may not be universally extolled. For example, if the beneficiary of a restraining order traveled to Las Vegas, Nevada, pursued there by the restrained spouse in violation of the order, the Las Vegas police, with little, if any, knowledge of Colorado law might not proceed with the vigor the majority demands. In consequence of such ignorance and indolence they might be sued and the City of Las Vegas as well, on a claim of indifference (just as the City of Castle Rock finds itself in this case).

trial pursuant to law.

(Emphasis added.)

I see no language imposing a duty, or establishing rights amounting to an entitlement, in Colo. Rev. Stat. § 18-6-803.5 that is not also found in Colo. Rev. Stat. § 31-4-112. In fact, Colo. Rev. Stat. § 31-4-112 admits to less police discretion. So the syllogism should yield uniform results across the regulated spectrum, perhaps uncomfortably. When police officers break up a barroom fray and all participants promise to behave, if no one was injured the officers might simply dispatch them to their respective homes to sleep it off. Most would agree that prudent husbandry of police resources, good community relations, and a dollop of common sense would not always require the considerable inconvenience and expense occasioned by arrest, transportation, and booking when a citation or a warning would suffice–in spite of clear statutory direction to the contrary. Apparently, the police can now be hauled into federal court if, with the benefit of hindsight, it appears their judgment was flawed and one of the miscreants sent home to ruminate decided instead to resume hostilities. Under the majority decision, the victim would have an "entitlement to enforcement" of the statute (apprehension of the disorderly) because the statute contains "objective predicates" which "mandate the outcome" and "limit discretion." Majority Op., pp. 17-18.

In like vein, Colo. Rev. Stat. § 8-4-123 provides:

(1) The general assembly hereby finds, determines, and declares that

-14-

many businesses, such as nursing homes or building management companies, either desire or are required by law to have staff on premises at all times. As part of the compensation for such employees, many employers offer housing to employees. However, once that employment relationship ceases, it may become undesirable for such employees to occupy the premises for many reasons, including the safety of the employer's patients, clients, customers, or tenants.

\* \* \* \*

(2)(a) . . . A termination of a license to occupy the premises shall be effective three days after the service of written notice of termination of a license to occupy the premises.

\* \* \* \*

(3) If an employee fails to vacate the premises within three days after the receipt of the notice of termination of the license to occupy the premises, the employer may contact the county sheriff to have the employee removed from the premises. The county sheriff **shall remove** the employee and any personal property of the employee from the premises upon the showing to the county sheriff of the notice of termination of the license to occupy the premises and agreement pursuant to which the license to occupy the premises was granted.

(Emphasis added.) The statute clearly states a purpose, at least in part, to protect patients. The only predicate for the sheriff's <u>required act</u> (removal) is seeing the notice of termination and the underlying agreement. Does the mandatory statutory language coupled with a limitation on discretion create an entitlement to enforcement, and *ipso facto* a property right, for a resident injured by a holdover staffer whenever the sheriff doesn't act, acts ineptly or too slowly? When, as the statute says, the sheriff is shown the notice and the agreement, does that end the debate, or would the sheriff be permitted additional inquiry? What kind of hearing

-15-

might be required and who could participate? And what are the collateral effects?

The majority emphasizes that the TRO triggered the requirements of Colo. Rev. Stat. § 18-6-803.5(3). But the fact that a judge made a threshold determination triggering the statutory provisions does not alter the analysis. The state court did not order anyone in the law enforcement community to do anything; it simply paraphrased the statutes in a form notice on the back of the order. Even if it had, independently and specifically, ordered enforcement the only remedy for a breach would be contempt of court. It could not create a private cause of action. The issue is not determined by the court order, but by statute and its resolution bottoms in legislative intent. Even if we presume the Colorado Legislature intended for the law enforcement community to heed its command, that does not imply a purpose to create a private cause of action or other entitlement amounting to a property right. *See infra,* n.15.

Qualified immunity has now been substantially eroded, if not eliminated, in all cases based upon mandatory and directive language contained in a statute. The law enforcement community is now on notice–"shall" means "shall"–and we shall brook no nonsense. Almost any such case, cleverly pled, will survive a motion to dismiss and quite possibly a motion for summary judgment. With the loss of immunity from liability goes the loss of immunity from suit. The rippling effects of what we have done here are obscured by narrow focus–the need for a global

-16-

approach to the issue of legislative purpose is evident.[12]

_____

[12] One might wonder if rights and entitlements could be implied from other Colorado Statutes. For instance, Colo. Rev. Stat. § 16-8-115.5 deals with the revocation of a conditional release of mentally ill criminal defendants, and provides in relevant part:

> (3) Whenever the superintendent of the Colorado mental health institute at Pueblo has probable cause to believe that such defendant has become ineligible to remain on conditional release as defined in section 16-8-102(4.5), said superintendent shall notify the district attorney for the judicial district where the defendant was committed. The superintendent or the district attorney **shall apply for a warrant** to be directed to the sheriff or a peace officer in the jurisdiction in which the defendant resides or may be found commanding such sheriff or peace officer to take custody of the defendant.
>
> * * * *
>
> (4) The sheriff or peace officer to whom the warrant is directed pursuant to subsection (3) of this section <u>shall take **all** necessary legal action</u> to take custody of the defendant. A sheriff **shall deliver the defendant immediately to the Colorado mental health institute** at Pueblo which shall provide care and security for the defendant.

(Emphasis added.) Would the superintendent and the district attorney be liable, under § 1983, to someone injured by a mentally ill defendant if, having probable cause, they did not apply for a warrant, or did it too slowly? And would the sheriff be liable under § 1983 if deputies failed or hesitated in taking **all** legal action necessary to take the defendant into custody or if they mistakenly took the defendant to a facility other than the Colorado mental health institute in Pueblo?

How far might this reasoning take us? Colo. Rev. Stat. § 12-47-301(4)(a) requires that "[a]ll sheriffs and police officers **shall see to it** that every person selling alcohol beverages within their jurisdiction has procured a license to do so." (Emphasis added.) Would that provision make state actors liable to the victim of a drunk (or underage) driver who obtained alcohol from an unlicensed vendor?

-17-

We must look to the entire fabric of Colorado law to determine if specific enforceable rights, qualifying as property, were created by enactment of the statute.[13]  If we are to determine whether the Colorado Legislature intended to confer a property right to the holder of a restraining order, a logical starting point is to examine its pronouncements with regard to public liability under state tort law. The Colorado Governmental Immunity Act (the Act), enacted in 1972 in response to the Colorado Supreme Court's abrogation of sovereign immunity in *Evans v. Board of County Comm'rs of El Paso County*, 482 P.2d 968 (Colo. 1971), is distinct and significant, not only because it comprehensively defines and details the circumstances of governmental immunity, but because it explicitly limits those public duties which may be a basis of governmental liability.

The purpose of the Act is to include,

within one article **all** the circumstances under which the state, any of its political subdivisions, or the public employees of such public entities may be liable in actions which lie in tort or could lie in tort **regardless** of whether that may be the type of action or the form of relief chosen."

Colo. Rev. Stat. § 24-10-102 (emphasis added).  Thus, in 1972 the Colorado General Assembly created, of whole cloth, "a statutory scheme whereby claimants with rights to particular causes of action can seek recovery."  *Colorado State Claims Bd. of Div. of Risk Mgmt. v. DeFoor*, 824 P.2d 783, 792 (Colo.), *cert. denied*, 506 U.S.

---

[13]*See Doyle*, 998 F.2d at 1569; *Nichols*, *infra*, n.6.

-18-

981 (1992).[14]  In his concurring opinion, Justice Rovira quoted the Act's language, cited above, and concluded a "claimants' right to pursue an action against the state is derived solely from the statutory exceptions listed in the Indemnity Act."  *Id*. at 795.  Two years later, the Colorado Court of Appeals said the Act "precludes the creation of new duties for public entities or employees, [but] it does not seek to limit prior existing common law duties."  *Gallegos v. City & County of Denver*, 894 P.2d 14, 19 (Colo. App. 1994).  The Act contains not even a hint that a "duty to arrest" could be the basis of an actionable wrong against the instrumentalities of government.[15]

I recognize that constitutional claims find their source separate from the common law principles underpinning tort law and do not suggest the Colorado Governmental Immunity Act controls Ms. Gonzales' claim.  *See Ruegsegger v. Jefferson County Bd. of County Comm'rs*, 197 F. Supp. 2d 1247, 1265-66 (D. Colo.

---

[14]In *DeFoor*, the Colorado Supreme Court, en banc, upheld the constitutionality of the Act regarding its cap on damages.  In so doing, it reiterated the history behind the Act.  824 P.2d 783.  As an adjunct, the court held that summary judgment was improvidently granted on claimants' § 1983 due process claim.  However, in that case there was no question that the claimed property right was recognized both before and after the passage of the Act.  *Id*. at 789.

[15]In fact, Colo. Rev. Stat. § 24-10-106(2) & (3) precludes an interpretation of the Act that results in "a waiver of sovereign immunity where the injury arises from the act, or failure to act, of a public employee [or public entity] where the act is the type of act for which the public employee would be or heretofore has been personally immune from liability."  However, the Act does allow a cause of action in those instances where the plaintiff alleges willful and wanton conduct on the part of the state actor.

1992). However, the fact of governmental immunity from state law suits such as this, the canvas upon which Colo. Rev. Stat. § 18-6-8803.5(3)(c) was painted, is a powerful instruction as to legislative intent when enacting the statute.

If we presume the legislature is aware of the state of the law when it acts or refrains from action, including interpretive decisions, then an exploration of the state of the law from 1994 through the date of this incident in 1999 should be revealing. Indeed it is. First, the statutory language "shall arrest . . . or seek a warrant," "shall use every reasonable means to enforce," "arrested person shall be removed . . . and shall be taken . . . for booking" could be highly directive without being an actionable wrong against government entities and actors who failed to heed its directives.[16] That is implicit in the legislature's decision not to include such liability in the Act. Second, the Act is constitutional. *DeFoor*, 824 P.2d 783. Third, in 1989, at least two United States Supreme Court cases, *DeShaney* and *Collins*, strongly implied that § 1983 liability would not be the handmaiden of statutes directing government actors as part of a remedy for social ills, be it the

---

[16] The pertinent inquiry is not whether the legislature expected the police to follow statutory directives, but if it intended to create a cause of action for abuse victims against communities and law enforcement officers. And if a remedy must necessarily be implied as part of a directive statute, the remedy would have to be administrative (discipline) or political because of the Governmental Immunity Act. *Gallegos*, 894 P.2d at 14. In that regard, I fail to see how the "legislative history" relied upon by the majority informs the debate. The testimony of interested parties at a hearing in one house of a bicameral assembly hardly telegraphs legislative intent. And second- or third-hand newspaper accounts are even less revealing.

abuse of children or of spouses. Fourth, well before this incident, the Colorado Supreme Court uttered a thoughtful and comprehensive opinion closely tracking *DeShaney* and precluding § 1983 liability in cases claiming substantive due process rights. *Henderson v. Gunther*, 931 P.2d 1150 (Colo. 1997).

The Colorado legislature's inclusion of the word "shall" simply cannot overcome the pervasive understanding at the time the statute was enacted that law enforcement is not liable for failing to protect citizens from the deliberate actions of third parties, except in very distinct circumstances. *Id.* And, regardless of its intent, the legislature could not create an actionable right against the police by the enactment of this statute without also amending the Act.[17] The claimed entitlement is not property; it comes so packaged in spite of legislative intent, not because of it. This result is the product of judicial choice.

Against this backdrop, *Sandin* is instructive. 515 U.S. at 482-84. *Sandin* held a prison regulation primarily designed to guide correctional officials in the administration of a prison did not confer a liberty interest on inmates, but attached procedural protections "of quite a different nature." *Id.* at 482. The Court eschewed the methodology employed by the majority here, finding it "shift[s] the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation." *Id.* The Court identified at least two "undesirable effects" resulting from sole reliance on the language of a

---

[17] *See infra,* n.12.

particular regulation or statute.  First, it creates disincentives for the codification of "procedures in the interest of uniform treatment," even though the regulations may enhance front-line performance in light of competing interests that must be balanced, i.e., the safety of the staff and inmate population.  *Id.*  Second, to avoid the creation of a protected interest, "[s]tates may . . . [have] scarcely any regulations, or . . . [confer] standardless discretion on correctional personnel."  *Id.*  In addition, the Court noted "the *Hewitt* approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone."  *Id.*; *Hewitt v. Helms*, 459 U.S. 460 (1983).  The Court recognized the dissonance of such outcome "to the view . . . that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."  *Sandin,* 515 U.S. at 482 (citations omitted).

The *Sandin* rationale aptly applies to this case.[18]  Undoubtedly, the Colorado legislature wished to address the malevolent effects of domestic violence and encourage uniform enforcement when it passed and amended Colo. Rev. Stat. § 18-6-803.5.  This decision frustrates those purposes and yields a practical anomaly; states which actively promote police involvement in combating domestic violence by

---

[18] *Sandin* expressly abandoned the syllogistic approach only for prisoner liberty interest claims, leaving the issue open in other cases, much like *DeShaney* left open procedural due process issues.  But if principle is to account for anything, *Sandin* demands our attention.

-22-

employing highly directive language, are subject to § 1983 litigation for their efforts, but states choosing a tepid approach are immune. *Id*. at 489; *cf. Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) (when an administrator has unfettered discretion in making prison transfer there is no liberty interest for the due process clause to protect). Should the majority's approach go national, states may adjust their statutes (not only family violence, but others as well) to avoid federal litigation and potential § 1983 liability, thereby leaving the statutes void of meaningful guidance and subject to uneven application. Additionally, this holding invites lawyers and federal judges to interfere with state efforts at remediation. *Sandin*, 515 U.S. at 482. Finally, it fails to recognize and internalize systemic costs. This decision will encourage others to scour state statutes and regulations in search of mandatory language on which to base their entitlement claims. *Id.* at 481. My efforts in identifying a few statutory candidates merely scratch the surface and we are naive in ignoring the potential problem.

The inability of Ms. Gonzales to state a substantive due process claim does not deprive her of state tort remedies, whatever they may be.[19] *DeShaney*, 489 U.S.

---

[19]*See Macaluso v. Knowles*, 775 A.2d 108, 116 (N.J. Super. App. Div.2001) (no special relationship exception to Tort Claims Act in New Jersey), *overruling Campbell v. Campbell*, 682 A.2d 272 (N.J. Super. L. Div. 1996) (cited by the majority for the proposition that state law analysis admits police officer liability for failure to enforce domestic violence restraining order); *Nearing v. Weaver*, 670 P.2d 137, 143 n.8 (Or. 1983) (duty to arrest domestic order violator not discretionary despite requirement that arrest be supported by probable cause. The court noted, "[i]t would, of course, be desirable if legislatures were to indicate their intention to allow or to withhold the right of those injured by violations of

189; *Henderson*, 931.P.2d 1150.  The artifice of federalizing state tort law under the

rubric of procedural due process is unsettling.

_____

statutes passed for their benefit to recover damages from the violator, if not in each individual statute, than by enacting some general formula . . . ." (internal citations omitted)).  The Colorado legislature did so, to no avail.

     In *Campbell*, the Superior Court of New Jersey, Law Division, Civil Part, Union County, said:
> A second reason why this immunity for failure to make an arrest is inapplicable is that the restraining order established a "special relationship" between the Plainfield Police and plaintiff, which creates an exception to the immunity statute.  The court explained the special relationship exception in *Lee v. Doe,* 232 *N.J.Super.* 569, 557 *A.*2d 1045 (App.Div.1989).

682 A.2d at 275.

     In *Macaluso*, the Superior Court of New Jersey, Appellate Division, said, "[i]t is noteworthy that in *Lee* we upheld the public entity's immunity.  *Lee, supra,* 232 *N.J.Super.* at 581, 557 *A.*2d 1045.  The assertion to the contrary in *Campbell v. Campbell,* 294 *N.J.Super.* 18, 25, 682 *A.*2d 272 (Law Div.1996), is clearly erroneous and should be disregarded."  775 A.2d at 110-11.

     The state cases cited by the majority, *Macaluso* and *Nearing* (and, for what it is worth, *Campbell*), address important question of tort liability and immunity therefrom.  Those issues are properly left to the states.

Case No. 7 0 W ▢ 8 ▢ ▢

## TEMPORARY RESTRAINING ORDER PURSUANT TO SECTION 14-10-108, C.R.S.

_Jessica Ruth Gonzales_ , Petitioner,

v.

_Simon James Gonzales_ , Respondent.

COPY

TO: _____

THE COURT FINDS it appropriate to issue this restraining order pursuant to Section 14-10-108, C.R.S. and that irreparable injury would result to the moving party if no order was issued.

IT IS ORDERED THAT:

☒ You may not molest or disturb the peace of the other party or of any child.

☒ You may not transfer, encumber, conceal, or in any way dispose of any property, except in the usual course of business or for the necessities of life. You must notify the other party of any proposed extraordinary expenditures and account to the court for all extraordinary expenditures made after this order is issued.

☒ THE COURT FURTHER FINDS that physical or emotional harm would result if you are not excluded from the family home or the home of the other party.

IT IS ORDERED THAT:

You shall not enter the family home or the home of the other party, located at _4943 Wildflowers Wy._
Street
_Castle Rock_ _Co_ and shall remain at least _100_ yards
City State
away from this location at all times.

B. ~~THE COURT FURTHER FINDS that the award of interim legal custody of the child(ren)~~

_Rebecca L. Gonzales_ , born _May 20, 1989._
_Katheryn N. Gonzales_ , born _Oct 12, 1990._
_Leslie O. Gonzales_ , born _March 20, 1992._

to the other party is necessary to prevent domestic abuse or prevent the child(ren) from witnessing domestic abuse.

☒ IT IS FURTHER ORDERED THAT:

~~Def~~ Respondent, with 2 days' notice to petitioner, may appear and move for dissolution or modification of this order per CRS 14-10-108(6)

_May 21, 1995_
Date

I certify that this is a true and complete copy of the original order.

_5-21-94_
Date

PLEASE NOTE: IMPORTANT NOTICES FOR RESTRAINED PARTIES AND LAW ENFORCEMENT OFFICIALS ON REVERSE.

JDF 439 2/95   TEMPORARY RESTRAINING ORDER PURSUANT TO SECTION 14-10-108, C.R.S.   A-29

(1) Court Copy          (2) Protected Personal Copy          (3) Distribute as Applicable          (4) Distribute as Applicable

WARNING: A KNOWING ___ LATI__ OF A RESTRAINING ORDER IS A CT ___ : UN__ __ SECTION 18-6-803.5, C.R.S. A VIO-
LATION MAY SUBJECT YOU TO FINES OF UP TO $5,000 AND UP TO EIGHTEEN MONTHS IN JAIL. A VIOLATION WILL
ALSO CONSTITUTE CONTEMPT OF COURT. YOU MAY BE ARRESTED WITHOUT NOTICE IF A LAW ENFORCEMENT
OFFICER HAS PROBABLE CAUSE TO BELIEVE THAT YOU HAVE KNOWINGLY VIOLATED THIS ORDER. IF YOU VIOLATE
THIS ORDER THINKING THAT THE OTHER PARTY OR A CHILD NAMED IN THIS ORDER HAS GIVEN YOU PERMISSION
YOU ARE WRONG, AND CAN BE ARRESTED AND PROSECUTED. THE TERMS OF THIS ORDER CANNOT BE CHANGED
BY AGREEMENT OF THE OTHER PARTY OR THE CHILD(REN). ONLY THE COURT CAN CHANGE THIS ORDER. YOU
MAY APPLY AT ANY TIME FOR THE MODIFICATION OR DISMISSAL OF THIS RESTRAINING ORDER

PURSUANT TO SECTION 14-4-102(7.5), C.R.S., IF YOU HAVE BEEN EXCLUDED FROM A SHARED RESIDENCE, YOU MAY
GO INTO THE HOME ONCE, IN THE COMPANY OF A LAW ENFORCEMENT OFFICER, TO OBTAIN UNDISPUTED PER-
SONAL EFFECTS SUFFICIENT TO MAINTAIN A NORMAL STANDARD OF LIVING. YOU MAY NOT GO INTO THE HOME
UNLESS A LAW ENFORCEMENT OFFICER IS WITH YOU.

THIS ORDER IS IN EFFECT UNTIL THE DISPOSITION OF THIS ACTION, OR, IN THE CASE OF AN APPEAL, UNTIL THE
DISPOSITION OF THE APPEAL.

NOTICE TO LAW ENFORCEMENT OFFICIALS: YOU SHALL USE EVERY REASONABLE MEANS TO ENFORCE THIS
RESTRAINING ORDER. YOU SHALL ARREST, OR, IF AN ARREST WOULD BE IMPRACTICAL UNDER THE CIRCUM-
STANCES, SEEK A WARRANT FOR THE ARREST OF THE RESTRAINED PERSON WHEN YOU HAVE INFORMATION
AMOUNTING TO PROBABLE CAUSE THAT THE RESTRAINED PERSON HAS VIOLATED OR ATTEMPTED TO VIOLATE
ANY PROVISION OF THIS ORDER AND THE RESTRAINED PERSON HAS BEEN PROPERLY SERVED WITH A COPY OF
THIS ORDER OR HAS RECEIVED ACTUAL NOTICE OF THE EXISTENCE OF THIS ORDER. YOU SHALL ENFORCE THIS
ORDER EVEN IF THERE IS NO RECORD OF IT IN THE RESTRAINING ORDER CENTRAL REGISTRY. YOU SHALL TAKE
THE RESTRAINED PERSON TO THE NEAREST JAIL OR DETENTION FACILITY UTILIZED BY YOUR AGENCY. YOU ARE
AUTHORIZED TO USE EVERY REASONABLE EFFORT TO PROTECT THE ALLEGED VICTIM AND THE ALLEGED VIC-
TIM'S CHILDREN TO PREVENT FURTHER VIOLENCE. YOU MAY TRANSPORT, OR ARRANGE TRANSPORTATION FOR
THE ALLEGED VICTIM AND/OR THE ALLEGED VICTIM'S CHILDREN TO SHELTER.

No. 01-1053 - <u>Gonzales v. City of Castle Rock</u>

**HARTZ**, Circuit Judge, dissenting, with whom **TACHA**, Chief Circuit Judge, and **KELLY**, Circuit Judge, join:

The other dissents (with which I agree) have covered the issues well, so I can be brief.

First, Judge O'Brien has demonstrated that to construe the Colorado statute as mandatory produces results that could not have been intended by the legislature. The better reading of the statute is that it is directory, a hortatory expression by the legislature. Professor Kenneth Culp Davis examined "full enforcement" statutes—statutes commanding that law enforcement officers "shall" enforce the criminal law—in his classic book <u>Police Discretion</u>. He concluded that such laws permit the exercise of police discretion regarding how much, and even whether, to enforce particular criminal statutes. He wrote:

> [A]lthough the case for literal interpretation of the full enforcement legislation is both obvious and strong, I believe the case for non-literal interpretation, though far from obvious, is unanswerable, even though it is based on a somewhat sophisticated analysis that may have little appeal to those lawyers and judges who make quick decisions without digging below the surface.

Kenneth C. Davis, <u>Police Discretion</u> 82 (1975). We should be hesitant to read "literally" those similar laws that appear to compel police officers to arrest all violators of particular statutes.

Second, even assuming that the <u>statute</u> created a property interest "owned" by Ms. Gonzales or her children (I agree with Judge Kelly that the <u>order</u> itself could

not create a property interest in enforcement of the order by law enforcement officers because public officials were not parties to the proceeding for issuance of the order), I see no violation of procedural due process in this case. The purpose of "procedures" required by procedural due process is to improve how neutral decisionmakers are informed before making a decision. The procedures are to ensure, to the extent appropriate in the circumstances, that the decisionmaker has relevant information for the tasks of finding facts and determining what action is proper in light of those facts. Here, the decisionmaker, a law enforcement officer, needs information to decide (1) whether there is probable cause to believe that the subject of a protective order has violated the order and (2) if so, what is the best response to the violation (an arrest, a warning, or whatever). Given the limited time in which the officer must act, an adversary evidentiary hearing—the gold standard of procedural due process—is not feasible.

In my view, all that procedural due process could require in this context is an opportunity (1) to present evidence of a violation of the order and (2) to argue why an arrest is the proper response to the violation. Ms. Gonzales was given that opportunity. The tragedy is that the decisionmakers did not heed her pleas. But no amount of procedural due process can guarantee that a decisionmaker will make the right decision. Contrary to the analysis of the majority opinion, which sets forth a three-step process for how officers must decide whether to arrest someone, procedural due process is not concerned with how neutral decisionmakers "process"

information within their own minds. As Judge McConnell explains, errors by decisionmakers raise questions only of substantive due process.